No. 13-30329
(adl 13-30330)
_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**
_____

IN RE: DEEPWATER HORIZON
_____

BP EXPLORATION & PRODUCTION INC. and
BP AMERICA PRODUCTION COMPANY,

*Plaintiffs-Appellants*,

VERSUS

DEEPWATER HORIZON COURT SUPERVISED SETTLEMENT PROGRAM
and PATRICK A. JUNEAU, in his official capacity as Claims Administrator of the
*Deepwater Horizon* Economic and Property Damages Settlement Agreement, and
in his official capacity as Trustee of the *Deepwater Horizon* Economic and
Property Damages Settlement Trust,

*Defendants-Appellees*.
_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA
MDL No. 2179, Civ. A. No. 13-492
_____

**DEFENDANTS-APPELLEES' OPPOSITION TO
BP EXPLORATION & PRODUCTION INC. and
BP AMERICA PRODUCTION COMPANY'S
MOTION TO CONSOLIDATE APPEALS**

Richard C. Stanley, 8487
Jennifer L. Thornton, 27019
Gina M. Palermo, 33307
Patrick H. Fourroux, 34550
        Of
STANLEY, REUTER, ROSS,
  THORNTON & ALFORD, L.L.C.
909 Poydras Street, Suite 2500
New Orleans, Louisiana 70112
Telephone: (504) 523-1580
Facsimile: (504) 524-0069

*Attorneys for Deepwater Horizon Court Supervised Settlement Program and Patrick A. Juneau, in his official capacity as Claims Administrator of the Deepwater Horizon Court Supervised Settlement Program administering the Deepwater Horizon Economic and Property Damages Settlement Agreement*

## OPPOSITION TO BP'S MOTION TO CONSOLIDATE APPEALS

Defendants-Appellees Deepwater Horizon Court Supervised Settlement Program ("Settlement Program") and Patrick A. Juneau, in his official capacity as Claims Administrator of the Deepwater Horizon Court Supervised Settlement Program administering the Deepwater Horizon Economic and Property Damages Settlement Agreement ("Settlement Agreement"), and in his official capacity as Trustee of the Deepwater Horizon Economic and Property Damages Settlement Trust, through undersigned counsel, respectfully submit this opposition to BP Exploration & Production Inc. and BP America Production Company's (collectively, "BP") motion to consolidate its three recent appeals from various proceedings and rulings of the district court.

## I.     INTRODUCTION

At the outset, it needs to be clarified that BP has filed *three* different appeals from three different district court orders in the past week.

- *First*, on April 3, 2013, BP filed a Notice of Appeal from the district court's written interlocutory order dated March 5, 2013, in *Bon Secour Fisheries, Inc., et al. v. BP Exploration & Production Inc., et al.*, E.D. La. No. 12-cv-970, regarding the interpretation and implementation of the Business Economic Loss ("BEL") framework in the Settlement Agreement.  The Settlement Program and Mr. Juneau are not parties in that lawsuit or the

1

MDL, such that they are not parties to that appeal, which was docketed in this Court as No. 13-30315.[1]

- *Second*, on April 5, 2013, BP filed a Notice of Appeal from the district court's interlocutory ruling in open court on that same date denying BP's motion for a preliminary injunction in the *Bon Secour* case. That motion sought to enjoin the Claims Administrator from continuing to process BEL claims pursuant to the district court's March 5, 2013 ruling (which is the subject of the first appeal). Although the injunctive relief requested would impact the Claims Administrator's processing of claims under the Settlement Agreement, again, he is not a party in the *Bon Secour* case. BP's second appeal was docketed in this Court as No. 13-30329.

- *Third*, on April 5, 2013, BP filed a third Notice of Appeal from the district court's ruling in a **separate lawsuit** filed by BP against the Settlement Program and Mr. Juneau, granting those parties' Motion to Dismiss Pursuant

---

[1] Mr. Juneau and the Settlement Program have been identified as interested parties in that appeal and BP's second appeal from a motion for preliminary injunction, as the district court requested briefing from them regarding their position on the request. As discussed further herein and as reflected in the transcript from the April 5, 2013 hearing, their "position" is simply that they are bound to apply the Settlement Agreement pursuant to its terms and conditions and to follow the district court's orders with respect to the interpretation and implementation of the Settlement Agreement. *See* Transcript of 4/5/13 hearing, attached as Ex. A, at 36.

to Rule 12(b)(6).[2]  That case (E.D. La. No. 13-cv-492), is the only case in which Mr. Juneau and the Settlement Program are parties.  BP's appeal from the dismissal of its lawsuit was docketed in this Court under No. 13-30329, but as an additional or related case assigned docket No. 13-30330.

Despite BP's filing of multiple pleadings in this Court treating its appeal from the dismissal of the separate lawsuit against Mr. Juneau and the Settlement Program as if it were already consolidated with BP's appeal from the denial of a preliminary injunction in the *Bon Secour* matter, presumably because they were both docketed under the lead docket number of 13-30329, there has been no such order of consolidation in this Court.  Moreover, as detailed below, Mr. Juneau and the Settlement Program object to consolidation of this appeal with BP's other two recently-filed appeals, as they are not parties to those appeals and the appeals have different jurisdictional premises, raise different legal and factual issues, and involve different standards of review.

## II.    **STANDARD FOR CONSOLIDATION**

Federal Rule of Appellate Procedure 3(b)(2) provides for the consolidation of appeals either by motion or by the Court *sua sponte*.  Beyond that, the Rules are silent as to the relevant considerations for granting or denying a motion to

---

[2] BP filed a notice of appeal immediately following the district court's ruling in open court on April 5, 2013.  The district court issued a written final judgment dismissing the case, however, on April 8, 2013.  Ex. B.

consolidate. When deciding whether to consolidate appeals, this Court and other appellate courts have typically considered the following factors:

- Whether the appeals arise out of the same transaction;

- Whether judicial efficiency is furthered by the consolidation;

- Whether the appeals depend on the same underlying facts;

- Whether the appeals involve the same legal issues;

- Whether the appeals sought to be consolidated are duplicative of one another; and

- Whether consolidation appears to be the course most convenient, expeditious, or inexpensive to the parties.

*See Devlin v. Scardelletti*, 536 U.S. 1, 13-14, 122 S. Ct. 2005, 2012 (2002); *Clay v. University of Texas Medical Branch at John Sealy*, 167 Fed. Appx. 983, 984, 2006 WL 384987, *1 (5th Cir. 2006); *Chem One, Ltd. v. M/V RICKMERS GENOA*, 660 F.3d 626, 642 (2d Cir. 2011). *See also* 36 C.J.S. Federal Courts § 641 (citing *Board of Drainage Com'rs of Pender County Drainage Dist. No. 4 v. Lafayette Southside Bank of St. Louis*, 27 F.2d 286 (4th Cir. 1928)). The one case cited by BP in support of its motion, *Elizondo v. Green*, 671 F.3d 506 (5th Cir. 2012), for instance, involved two appeals by the same plaintiffs from the granting of summary judgment motions in the same case, with each appeal addressing the dismissal of a different defendant. But that is not the situation here; and, the

factors listed above weigh against consolidation of this appeal with BP's other appeals.

## III.  <u>CONSOLIDATION IS IMPROPER</u>

Although, certainly, BP's three appeals are related to one another to the extent that all three arise from different proceedings in the district court aimed at challenging the current interpretation and implementation of the BEL framework in the Settlement Agreement, this appeal arises from a separate lawsuit between different parties, which was dismissed on the legal basis that BP had failed to state a claim for breach of contract upon which relief can be granted.[3]  The only two issues before the district court on the motion were whether: (1) BP's complaint stated a viable claim for breach of contract against the Defendants-Appellants, and (2) Mr. Juneau was entitled to immunity for quasi-judicial actions taken in his capacity as Claims Administrator and Trustee.  The district court granted the motion on the first basis and did not rule on the judicial immunity argument,[4] contrary to BP's discussion in its emergency motion for an injunction filed in this Court on April 8, 2013.

---

[3] BP had also filed an emergency motion for preliminary injunction in the lawsuit against the Defendants-Appellees, but that motion was denied as moot (and, thus, not considered on the merits) based on the district court's decision to grant the Rule 12(b)(6) motion.  *See* Transcript, Ex. A, at 64.

[4] *Id.* at 63-64; 4/8/13 Judgment, Ex. B hereto.

As demonstrated by the transcript from the April 5, 2013 hearing, the Defendants-Appellees' motion to dismiss did not turn on the merits of BP's underlying allegations about the interpretation of the Settlement Agreement, which frame the issues for review in the other two appeals, but rather on whether, as a matter of law, the named defendants could be sued for implementing and administering the Settlement Agreement consistently with the district court's prior rulings and instructions. And critically, as the Claims Administrator and the Settlement Program made clear both in this case in the district court and in a "response" to the request for injunctive relief filed in the *Bon Secour* matter, Mr. Juneau was not involved in the negotiating of the Settlement Agreement and recognizes that it is not his role to advocate for or against any particular interpretation. Rather, as Claims Administrator and Trustee, he is to interpret, administer, and implement the Settlement Agreement pursuant to his understanding of its terms and the directives of the supervising and reviewing courts, and to make payments to claimants accordingly.

Apart from these distinctions, as noted above, this appeal also is from a final judgment of the district court dismissing BP's complaint and, thus, has a different jurisdictional premise than BP's appeals from the interlocutory rulings in the *Bon*

*Secour* case.[5]  Further, the standards of review below and on appeal vary in the different matters.  Here, the Court will apply the same standard as the district court to determine whether the complaint states a claim upon which relief can be granted.  *See Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007).  With respect to the denial of BP's motion for a preliminary injunction in *Bon Secour*, the Court will have to review the record and determine whether the district court abused its discretion in denying relief.  *See Janvey v. Alguire*, 647 F.3d 585, 591-92 (5th Cir. 2011) (explaining, however, that legal conclusions underlying a ruling on a preliminary injunction will be reviewed *de novo*).  And it is not immediately clear what standard the Court should apply to any review of the district court's March 5, 2013 interlocutory order regarding the interpretation of the BEL framework.

Finally, given the disparate procedural postures of the appeals, that the Defendants-Appellees herein are not parties in the *Bon Secour* appeals, and that there is little to no overlap of factual or legal issues to be reviewed on this appeal, consolidation is not judicially efficient or more convenient for the parties.

---

[5] In fact, it is not entirely clear that BP's appeals in the *Bon Secour* case are proper under the collateral order doctrine and/or 28 U.S.C. § 1292 (Interlocutory decisions).

IV.    **CONCLUSION**

For the foregoing reasons, the Settlement Program and Mr. Juneau object to the consolidation of this appeal with the appeals from the interlocutory rulings in the *Bon Secour* case and request that the Court deny BP's motion.

Dated: April 11, 2013

Respectfully submitted,

*/s/ Jennifer L. Thornton*
Richard C. Stanley, 8487
Jennifer L. Thornton, 27019
Gina M. Palermo, 33307
Patrick H. Fourroux, 34550
rcs@stanleyreuter.com
jlt@stanleyreuter.com
gmp@stanleyreuter.com
phf@stanleyreuter.com
    Of
STANLEY, REUTER, ROSS,
  THORNTON & ALFORD, L.L.C.
909 Poydras Street, Suite 2500
New Orleans, Louisiana 70112
Telephone:   (504) 523-1580
Facsimile:    (504) 524-0069

*Attorneys for Defendants-Appellees Deepwater Horizon Court Supervised Settlement Program and Patrick A. Juneau, in his official capacity as Claims Administrator of the Deepwater Horizon Court Supervised Settlement Program administering the Deepwater Horizon Economic and Property Damages Settlement Agreement, and in his official capacity as Trustee of the Deepwater Horizon Economic and Property Damages Settlement Trust*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the above and foregoing Opposition to Motion to Consolidate Appeals has been served upon the following electronically and/or by email, this 11th day of April, 2013:

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
Wendy L. Bloom
Andrew B. Bloomer, P.C.
R. Chris Heck
Timothy A. Duffy
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL 60654

Jeffrey Bossert Clark
Steven A. Myers
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005

Theodore B. Olson
*Counsel of Record*
Miguel A. Estrada
Thomas G. Hungar
Scott P. Martin
GIBSON, DUNN & CRUTCHER
LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036

George H. Brown
GIBSON, DUNN & CRUTCHER
LLP
1881 Page Mill Road
Palo Alto, CA 9430S

Gene Fendler
Don K. Haycraft
R. Keith Jarrett
LISKOW & LEWIS
701 Poydras Street, Suite 5000
New Orleans, LA 70139

Robert C. Mike Brock
COVINGTON & BURLING, LLP
1201 Pennsylvania Avenue, N.W.
Washington, D.C. 20004

Stephen Jay Herman
Soren Gisleson
HERMAN HERMAN & KATZ LLP
820 O'Keefe Avenue
New Orleans, LA 70113

James Parkerson Roy
DOMENGEAUX,WRIGHT, ROY &
EDWARDS
Suite 500
556 Jefferson Street
Lafayette, LA 70501

Samuel Issacharoff
NEW YORK UNIVERSITY
SCHOOL OF LAW
Washington Square, S., Suite 411J
New York, NY 10002


  /s/ *Jennifer L. Thornton*

| | |
|---|---|
| 1 | UNITED STATES DISTRICT COURT |
| | EASTERN DISTRICT OF LOUISIANA |
| 2 | |

```
 1                UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF LOUISIANA
 2
    ************************************************************
 3
    IN RE:  OIL SPILL BY THE          Docket No. MDL-2179
 4  OIL RIG DEEPWATER HORIZON         New Orleans, Louisiana
    IN THE GULF OF MEXICO ON          Friday, April 5, 2013
 5  APRIL 20, 2010
 6
    ************************************************************
    BON SECOUR FISHERIES, INC.
 7
                                      Docket No. 12-CV-970
 8  VS.                               Section "J"
                                      New Orleans, Louisiana
 9                                    Friday, April 5, 2013
    BP EXPLORATION & PRODUCTION,
10  INC, ET AL
    ************************************************************
11  BP EXPLORATION & PRODUCTION,
    INC, ET AL
12                                    Docket No. 13-CV-492
    VS.                               Section "J"
13                                    New Orleans, Louisiana
                                      Friday, April 5, 2013
14  DEEPWATER HORIZON COURT
    SUPERVISED SETTLEMENT PROGRAM, ET AL
15  ************************************************************
16
                 TRANSCRIPT OF MOTION PROCEEDINGS
17       HEARD BEFORE THE HONORABLE CARL J. BARBIER
                 UNITED STATES DISTRICT JUDGE
18
19  APPEARANCES:
20  FOR THE PLAINTIFFS:          HERMAN, HERMAN, KATZ & COTLAR, LLP
                                 BY:  STEPHEN J. HERMAN, ESQ.
21                                    SOREN GISELSON, ESQ.
                                 820 O'Keefe Avenue
22                               New Orleans, LA 70113
23                               DOMENGEAUX, WRIGHT, ROY & EDWARDS
                                 BY:  JAMES P. ROY, ESQ.
24                               P. O. BOX 3668
                                 556 JEFFERSON ST.
25                               LAFAYETTE, LA 70502-3668
```

EXHIBIT A

```
 1                        LEWIS KULLMAN STERBCOW & ABRAMSON
                          BY:  PAUL M. STERBCOW, ESQ.
 2                        601 POYDRAS STREET, SUITE 2615
                          NEW ORLEANS, LA 70130
 3
                          IRPINO LAW FIRM
 4                        BY:  ANTHONY IRPINO, ESQ.
                          2216 Magazine St.
 5                        New Orleans, LA 70130

 6                        WILLIAMS LAW GROUP
                          BY:  CONRAD "DUKE" WILLIAMS, ESQ.
 7                        435 Corporate Drive, Suite 101
                          Maison Grand Caillou
 8                        Houma, LA 70360

 9                        BREIT DRESCHER IMPREVENTO & WALKER
                          BY:  JEFFREY A. BREIT, ESQ.
10                        1000 Dominion Tower
                          999 Waterside Drive
11                        Norfolk, VA 23510

12                        CUNNINGHAM BOUNDS, LLC
                          BY:  ROBERT T. CUNNINGHAM, ESQ.
13                        1601 Dauphin St.
                          Mobile, AB 33604
14
                          WILLIAMSON & RUSNAK
15                        BY:  JIMMY WILLIAMSON, ESQ.
                          4310 Yoakum Blvd.
16                        Houston, TX 77006

17                        MOTLEY RICE
                          BY JOSEPH D. RICE, ESQ.
18                        28 Bridgeside Blvd.
                          Mount Pleasant, SC 29464
19
                          BRADLEY, MURCHISON, KELLY & SHEA
20                        BY:  JOEL A. RICE, ESQ.
                          401 Edwards St., 10th Floor
21                        Shreveport, LA 71101

22                        FAYARD & HONEYCUTT
                          BY:  CALVIN C. FAYARD, JR., ESQ.
23                        519 Florida Ave., SW
                          Denham Springs, LA 70726
24

25
```

EXHIBIT A

```
 1                                      LIEFF CABRASER HEIMANN & BERNSTEIN
                                        BY:  ELIZABETH J. CABRASER, ESQ.
 2                                      275 Battery St., 29th Floor
                                        San Francisco, CA 94111
 3

 4   FOR THE STATE OF ALABAMA:          ATTORNEY GENERAL OF ALABAMA
                                        BY:  COREY L. MAZE, ESQ.
 5                                      500 Dexter Ave.
                                        Montgomery, AB 36130
 6

 7   FOR BP EXPLORATION &
     PRODUCTION INC., ET AT:            KIRKLAND & ELLIS
 8                                      BY:  RICHARD C. GODFREY, ESQ.
                                             ANDREW B. BLOOMER, ESQ.
 9                                      300 N. LaSalle
                                        Chicago, IL 60654
10
                                        LISKOW & LEWIS
11                                      BY:  S. GENE FENDLER, ESQ.
                                             R. KEITH JARRETT, ESQ.
12                                      One Shell Square, Suite 5000
                                        701 Poydras St.
13                                      New Orleans, LA 70139

14                                      KIRKLAND & ELLIS
                                        BY:  JEFFREY B. CLARK, ESQ.
15                                      655 Fifteenth St., N.W.
                                        Washington, D.C. 20005
16
                                        DENTONS US
17                                      BY:  JEFFREY LENNARD, ESQ.
                                        7800 Sears Tower
18                                      233 South Wacker Dr.
                                        Chicago, IL 60606
19

20
     FOR PATRICK JUNEAU AND DEEPWATER
21   HORIZON COURT SUPERVISED
     SETTLEMENT PROGRAM:                STANLEY, REUTER, ROSS,
22                                      THORNTON & ALFORD
                                        BY:  RICHARD C. STANLEY, ESQ.
23                                           JENNIFER L. THORNTON, ESQ.
                                        909 Poydras St., Suite 2500
24                                      LL&E Tower
                                        New Orleans, LA 70112
25
```

EXHIBIT A

4

```
 1   OFFICIAL COURT REPORTER:          Karen A. Ibos, CRR, RMR, CCR
                                       500 Poydras St., Room HB-406
 2                                     New Orleans, LA 70130
                                       (504) 589-7776
 3                                     Karen_ibos@laed.uscourts.gov

 4
     Proceedings recorded by mechanical stenography.  Transcript
 5   produced by computer.

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

EXHIBIT A

```
 1                    P R O C E E D I N G S

 2                  (FRIDAY, APRIL 5, 2013)

 3                  (MOTION PROCEEDINGS)

 4

 5        (OPEN COURT.)

09:34:24  6              THE DEPUTY CLERK:  All rise.

09:34:26  7              THE COURT:  All right.  Please be seated, everyone.

09:34:29  8    Okay.  Call this matter, Stephanie.

09:34:32  9              THE DEPUTY CLERK:  MDL 10-2179, In re:  Oil spill by the

09:34:37 10    oil rig Deepwater Horizon in the Gulf of Mexico on April 20th,

09:34:41 11    2010; Civil Action 12-970, Bon Secour Fisheries, Incorporated,

09:34:48 12    et al., versus BP Exploration and Production, Incorporated, et al.;

09:34:52 13    Civil Action 13-492, BP Exploration and Production, Incorporated

09:34:58 14    et al., versus Deepwater Horizon Court Supervised Settlement

09:35:02 15    Program, et al.

09:35:04 16              THE COURT:  All right.  Counsel, make your appearances,

09:35:07 17    please.

09:35:09 18              MR. GODFREY:  Richard Godfrey on behalf of BP.  With me

09:35:13 19    is Andrew Bloomer, Jeff Clark, Keith Jarrett, Jeff Lennard, and the

09:35:20 20    Gene Fendler.

09:35:20 21              THE COURT:  Are you going to be doing the argument,

09:35:22 22    Mr. Godfrey?

09:35:22 23              MR GODFREY:  Yes, sir.

09:35:24 24              MR. HERMAN:  Steve Herman for the class, and with me is

09:35:27 25    most of the PSC class counsel I believe.
```

EXHIBIT A

09:35:30  1              THE COURT:  And you will be doing the argument,

09:35:31  2    Mr. Herman?

09:35:33  3              MR. HERMAN:  Yes, Your Honor.

09:35:33  4              THE COURT:  Okay.  Thanks.

09:35:34  5              MR STANLEY:  Good morning, Your Honor.  Rick Stanley and

09:35:36  6    Jennifer Thornton here for Pat Juneau and the settlement program.

09:35:40  7              THE COURT:  Okay.  Thank you.

09:35:47  8              All right.  Looks like we have several matters before the

09:35:52  9    Court this morning, but they're all really related.  First, as I

09:35:59 10    see it, there is a motion -- BP filed a motion in the Bon Secour

09:36:10 11    class action case, which is Civil Action 12-970.  BP has filed a

09:36:18 12    motion for preliminary injunction against Mr. Juneau in his

09:36:24 13    official capacity as the claims administrator and against the

09:36:28 14    settlement program itself, seeking to enjoin Mr. Juneau from

09:36:38 15    interpreting the business economic loss claim provisions in the

09:36:55 16    settlement in the manner in which he has interpreted them.

09:37:03 17              Second motion, the second matter is a completely new

09:37:08 18    lawsuit filed by BP, 13-492, which is *BP, et cetera, versus*

09:37:17 19    *Deepwater Horizon Court Supervised Settlement Program, et al.,*

09:37:23 20    which essentially is, as I see, is duplicative of the Motion For

09:37:31 21    Preliminary Injunction.  In fact, it asks for the identical

09:37:34 22    injunctive relief as I see it.  So they're really one and the same,

09:37:38 23    although they're filed in two different matters.

09:37:41 24              And then, thirdly, we have a Motion to Dismiss filed by

09:37:50 25    the defendants in 13-492, motion filed by Mr. Juneau as claims

EXHIBIT A

09:37:57 1  administrator and by the settlement program, a Rule 12(b)(6) Motion

09:38:03 2  to Dismiss for Failure to State a Claim.

09:38:06 3      Finally, the economic and property damage class,

09:38:11 4  represented by class counsel here today, have formally intervened

09:38:19 5  in the new lawsuit as defendants in 13-492 and everyone, obviously,

09:38:28 6  all of those parties, each of those parties have filed pleadings,

09:38:34 7  memoranda, and so forth either in support or opposition to these

09:38:38 8  matters.

09:38:40 9      The Court is very familiar with this issue.  That is

09:38:46 10  probably the biggest understatement I've made in a while.  I have

09:38:49 11  dealt with this issue.  This is at least the third time, fourth

09:38:52 12  time -- I'm losing track of how many times I've dealt with this

09:38:55 13  same identical issue, so I do not want to rehash everything that's

09:38:59 14  been said before.

09:39:02 15      I have gone through what you all have filed, which is

09:39:05 16  voluminous, and that's a grand understatement in itself.  Seems

09:39:11 17  like every time this matter rears its head again, there are more

09:39:16 18  documents, more exhibits, more declarations that are filed, so it's

09:39:20 19  a growing, living thing, it seems.  And I don't know when or what

09:39:29 20  it's going to take to finally resolve it, but I want to finally

09:39:32 21  resolve it here today.

09:39:34 22      So with that said, Mr. Godfrey, I will hear from you.  I

09:39:38 23  would like to talk about the Motion to Dismiss because I think that

09:39:42 24  precedes your Motion For Preliminary Injunction.  I am going to

09:39:45 25  give each side 20 minutes, by the way, so it's now 20 minutes to

EXHIBIT A

09:39:51  1    ten, Mr. Godfrey

09:39:52  2         MR GODFREY:  Thank you, Your Honor, and I deeply

09:39:54  3    appreciate the Court's taking the time to visit this issue.  I know

09:39:56  4    the Court has spent a great deal of time on it.  I would like to

09:40:00  5    try to reserve three minutes, but we'll see how it goes.

09:40:01  6         THE COURT:  You can do that if you would like.

09:40:04  7         MR GODFREY:  Thank you.

09:40:04  8         THE COURT:  Just have someone on your side keep count for

09:40:09  9    you.

09:40:09 10         MR GODFREY:  Mr. Lennard will keep the count.

09:40:12 11         THE COURT:  I don't have a clock up here.  It's not like

09:40:14 12    a Court of Appeal.  We are in sequestration.  I doubt they will

09:40:19 13    give me a clock.  The one I have up here, my batteries are dead, I

09:40:24 14    think.

09:40:24 15         MR GODFREY:  I can't solve that problem, Your Honor.

09:40:25 16         The Court knows we have two motions for preliminary

09:40:28 17    injunction.  The Court is intimately familiar with the issue.  I

09:40:30 18    would like to step back and see if we can find common ground, a

09:40:34 19    spot where perhaps we can all agree and then see whether, if we

09:40:36 20    agree on that spot, that has implications for whether or not BP

09:40:41 21    should be granted the relief that we seek.

09:40:44 22         Assume that a business prepares, a business claimant

09:40:48 23    prepares monthly financials in the ordinary course --

09:40:53 24         THE COURT:  Well, Mr. Godfrey, I'm sorry.  I really want

09:40:55 25    you to talk about the Motion to Dismiss first because I think that

09:40:59  1    has to precede everything else.

09:41:00  2            MR GODFREY:  Well, that -- the most --

09:41:02  3            THE COURT:  I want to know why I should not -- I want to

09:41:05  4    hear from you why I should not grant the Motion to Dismiss filed by

09:41:10  5    Mr. Juneau and the program.

09:41:14  6            MR GODFREY:  Well, number one, I don't think that he is

09:41:16  7    entitled to judicial immunity.  We laid that out in our brief.  He

09:41:20  8    is not a judicial officer.  He is not a special master.  So the

09:41:23  9    first argument that they raise is there's judicial immunity.  We've

09:41:25 10    laid out in our brief that he is not entitled to judicial immunity,

09:41:29 11    he is not exercising a judicial function.  He is not appointed

09:41:32 12    pursuant to Rule --

09:41:33 13            THE COURT:  Let me ask you about that.  I want to think

09:41:36 14    about the practical implications of what you're saying.  Despite

09:41:41 15    the fact that I know this settlement was negotiated over a long

09:41:46 16    period of time, I think about a year as I recall, and resulted in

09:41:52 17    a, roughly 1,000-page document that spelled out in great detail the

09:42:00 18    settlement agreement program, as with anything that you put in

09:42:04 19    writing, whether it be a statute, a regulation or a contract, there

09:42:16 20    will from time to time be disagreements about how that should be

09:42:19 21    interpreted or applied.  Do you agree with that?

09:42:21 22            MR. GODFREY:  That is correct, Your Honor.

09:42:23 23            THE COURT:  If that's the case, who is it in your view

09:42:30 24    that is empowered in this situation, has authority in the

09:42:33 25    circumstance we're in to interpret and decide how that is

EXHIBIT A

09:42:39  1    interpreted and applied?

09:42:40  2         MR. GODFREY:  Your Honor.  And Your Honor alone is

09:42:45  3    empowered to interpret it because it's a question of law in terms

09:42:45  4    of contract interpretation.  Mr. Juneau is to implement, not

09:42:49  5    interpret.

09:42:50  6         THE COURT:  Okay.  But somebody has to do it in the first

09:42:52  7    instance before it gets -- not every question comes to me

09:42:54  8    immediately.  You agree with that?

09:42:55  9         MR. GODFREY:  I would agree with that, Your Honor.

09:42:57 10         THE COURT:  So it seems to me what happened in this case

09:42:59 11    is pretty clear and pretty simple, not that the issue may not be

09:43:06 12    simple, but the -- procedurally is pretty simple in that there was

09:43:11 13    a disagreement at some point, at some point BP came to the

09:43:18 14    conclusion that they believed Mr. Juneau was and his staff were

09:43:30 15    wrongly interpreting the business economic claim matrix, I'll call

09:43:34 16    it.  Is that accurate?

09:43:35 17         MR. GODFREY:  That is correct.  We reached the conclusion

09:43:37 18    after we started to see awards that we could not reconcile with the

09:43:40 19    data underlying the awards.

09:43:42 20         THE COURT:  Okay.  And you brought that to his attention

09:43:44 21    in some fashion, correct?

09:43:45 22         MR. GODFREY:  We did bring that to his attention.

09:43:47 23         THE COURT:  As a result, he -- actually, and then he

09:43:51 24    heard from both sides in some fashion, invited memoranda, letters,

09:43:56 25    whatever way that was done, correct?

EXHIBIT A

09:43:58  1          MR. GODFREY:  Yes.  By that point in time, hundreds of

09:44:01  2     awards had been made --

09:44:02  3          THE COURT:  That's neither here nor there.  I'm trying to

09:44:05  4     get to procedurally what happened here.

09:44:07  5          MR. GODFREY:  Yes, there was a procedure.  On

09:44:08  6     December 16th, class counsel -- we were engaged in discussions.

09:44:11  7     Class counsel on December the 16th asked for a policy decision, we

09:44:14  8     briefed --

09:44:15  9          THE COURT:  Wait a minute.  You're getting way ahead of

09:44:16 10     me here.

09:44:17 11          MR. GODFREY:  My 20 minutes are short, Your Honor.

09:44:19 12          THE COURT:  So after he heard from both sides where each

09:44:25 13     side could not agree, did not agree on how this should be

09:44:29 14     interpreted or applied, he issued what he calls a policy statement,

09:44:34 15     which apparently there's been a number -- this is not the first

09:44:38 16     "policy statement" issued since the settlement.

09:44:40 17          MR. GODFREY:  That is correct, Your Honor.

09:44:41 18          THE COURT:  BP requested -- or somebody requested -- I

09:44:47 19     don't know if he did it on his own, not that it matters, but

09:44:51 20     somebody requested or invoked the three panel -- three-person panel

09:44:57 21     shortly thereafter, almost immediately thereafter, as I recall.

09:45:00 22          MR. GODFREY:  That is correct, Your Honor.

09:45:01 23          THE COURT:  And the three-person panel is envisioned --

09:45:07 24     designed in the settlement program to be the claims administrator,

09:45:12 25     a representative of class counsel, and a representative of BP,

EXHIBIT A

09:45:16  1    correct?

09:45:16  2            MR. GODFREY:  That is correct, Your Honor.

09:45:17  3            THE COURT:  And the way it's designed to work is they

09:45:19  4    meet, try to see if they can reach consensus, which I know they

09:45:24  5    have in other instances, there have been instances where that has

09:45:27  6    worked in that fashion, correct?

09:45:28  7            MR. GODFREY:  It in general has worked, Your Honor.  It

09:45:31  8    did not in this instance.

09:45:32  9            THE COURT:  Okay.  So after that was done and it didn't

09:45:37 10    result in a consensus, the settlement agreement provides that it

09:45:45 11    then comes up to the Court, whoever is not happy with it can bring

09:45:48 12    it to the attention of the Court, correct?

09:45:50 13            MR. GODFREY:  That is correct, Your Honor.

09:45:51 14            THE COURT:  And you did that?

09:45:52 15            MR. GODFREY:  That is entirely correct, Your Honor.

09:45:54 16            THE COURT:  We had -- this is only the second one we've

09:45:59 17    ever handled like this, that has gotten up to my level at least.

09:46:03 18            MR. GODFREY:  Fortunately, yes, Your Honor.

09:46:05 19            THE COURT:  Although, as I've said, I've now dealt with

09:46:08 20    this multiple times.  But when it comes to me, the procedure that

09:46:12 21    we had used and everyone agreed on is we handled it informally,

09:46:17 22    initially at least.  I met with you all at least twice, right?

09:46:20 23            MR. GODFREY:  The parties --

09:46:21 24            THE COURT:  Once in here and once in my conference room

09:46:23 25    as I recall.

EXHIBIT A

09:46:23  1          MR. GODFREY:  Yes, the parties met with Your Honor twice.

09:46:25  2          THE COURT:  And after the first meeting, I issued an -- I

09:46:29  3   guess I'd call it an informal ruling.  I said I agree with

09:46:33  4   Mr. Juneau's interpretation.  At some point thereafter, you came

09:46:37  5   back and said, "Would you reconsider and vacate your order?"  And I

09:46:44  6   am pretty sure BP -- you or someone, BP, suggested that "We think

09:46:48  7   maybe there is a way to resolve this amicably if you give us time

09:46:53  8   and send us back to talk to a mediator," correct?

09:46:57  9          MR. GODFREY:  Yes.  We went to a mediator and it failed.

09:47:01 10          THE COURT:  So I did that.  I set aside my January 30th,

09:47:05 11   I think it was, informal ruling.  I designated Mr. Dan Balhoff,

09:47:17 12   which both sides as I recall agreed to, who already was a

09:47:21 13   Court-appointed neutral for other purposes, and you all met with

09:47:27 14   him.

09:47:28 15          And at some point within the couple of weeks or so, I got

09:47:31 16   a report from him that he didn't see any way that the parties were

09:47:34 17   going to reach a resolution.  There was no way to amicably resolve

09:47:39 18   it.  Is that fair?

09:47:39 19          MR. GODFREY:  That is a fair statement, Your Honor.

09:47:41 20          THE COURT:  So then it was back in my lap, and I spent, I

09:47:50 21   think, a couple of weeks.  Of course, by this time -- I think I am

09:47:54 22   right -- we had just about started this trial that we've been in

09:47:58 23   now for six weeks, right around that time.

09:48:00 24          MR. GODFREY:  I think the trial started the 25th of

09:48:03 25   February.  I think, yes, that's correct.

EXHIBIT A

09:48:05 1       THE COURT:  Right around that time.  So in the midst of

09:48:08 2  trying to get this trial up and running and doing this, I spent

09:48:13 3  time as I could over the next couple of weeks re-reviewing

09:48:18 4  everything that everybody had submitted, and it, again, was

09:48:21 5  voluminous even back at that time because by this time you all had

09:48:26 6  submitted more documents.

09:48:28 7       Each time this matter has come back up, first in front of

09:48:32 8  Mr. Juneau, then in front of me informally, and then in front of me

09:48:36 9  a second time, the record grows.  So I've reviewed all of that

09:48:41 10 again.  And then I issued my March 5th, 2013, ruling, which is

09:48:50 11 Record Document 8812, where I set out my reasons and my

09:48:58 12 interpretation, my own interpretation of the settlement agreement

09:49:06 13 provisions in question and said that my interpretation agreed with

09:49:12 14 Mr. Juneau's interpretation.

09:49:16 15      So that led us up to -- that's the rough background,

09:49:22 16 quick summary of what has led us to where we are today.  So my

09:49:27 17 question is, I am having a real hard time -- I am just being honest

09:49:34 18 with you, Mr. Godfrey.  I am having a real hard time understanding

09:49:37 19 how BP is now asking me to enjoin Mr. Juneau from following my

09:49:47 20 order.  Basically you're asking me to enjoin myself, it seems to

09:49:53 21 me.

09:49:53 22      MR. GODFREY:  Well, not quite, Your Honor.

09:49:54 23      THE COURT:  Not quite.  I think that would be the effect

09:49:57 24 of it.  How else can I view it?

09:49:59 25      MR. GODFREY:  I think the Court knows we filed a notice

EXHIBIT A

09:50:01  1  of appeal, as I'd indicated in chambers, two weeks ago.

09:50:04  2          THE COURT:  I know that.  Yesterday.

09:50:07  3          MR. GODFREY:  Yes.  And as we've outlined in our papers,

09:50:11  4  the status quo is that awards for large amounts of money to people

09:50:17  5  who had suffered no loss whatsoever --

09:50:20  6          THE COURT:  Well, according to you.

09:50:21  7          MR. GODFREY:  According to --

09:50:23  8          THE COURT:  Not according to the parties who made the

09:50:26  9  claim.

09:50:26  10          MR. GODFREY:  Well, according to the expert declarations

09:50:28  11  on file, they suffered no loss.  What they're getting --

09:50:31  12          THE COURT:  The problem with that argument, as I see it,

09:50:33  13  is whether someone has sustained a loss is defined by the

09:50:38  14  agreement.  And if the plain terms of the agreement says someone

09:50:45  15  has -- passes the causation test and has sustained a loss, then

09:50:49  16  they've sustained a loss, whether you think they sustained a loss

09:50:52  17  in some real sense or other sense, or whether I think.

09:50:55  18          The whole point here, this is not like we're litigating

09:50:59  19  individual claims, and that's what the settlement is intended to

09:51:02  20  avoid.  And it seems to me the fundamental issue -- and I don't

09:51:06  21  want to get too far into the underlying merits today because I

09:51:10  22  don't think we need to go there.  I want to understand:  How is it

09:51:13  23  that you think -- or BP believes that I can enjoin a claims

09:51:20  24  administrator from obeying and following an explicit order of the

09:51:28  25  Court dated March 5th, 2013?

EXHIBIT A

09:51:30 1      MR. GODFREY:  There are two separate bases, Your Honor,

09:51:33 2  and I'll just cover them in the order in which we filed them.

09:51:36 3      As to the preliminary injunction motions themselves --

09:51:39 4  and you're correct that they are seeking identical relief, and I

09:51:42 5  explained in chambers when we went in chambers that it was a

09:51:45 6  belt-and-suspenders based on some guidance that Fifth Circuit

09:51:48 7  precedent had provided.

09:51:49 8      THE COURT:  Seems like this whole exercise is a

09:51:53 9  belt-and-suspenders operation.

09:51:54 10      MR. GODFREY:  Not quite.

09:51:55 11      THE COURT:  Well, what you're really trying to do, it's

09:51:58 12  quite obvious -- there's no subtlety here -- you're trying to get

09:52:03 13  this issue to the Fifth Circuit, and whether you have a right to do

09:52:06 14  that or not and whether they'll review it or not, I have no idea.

09:52:09 15  That's not for me to decide.

09:52:10 16      But I am trying to understand, you know, yesterday you

09:52:14 17  finally, BP filed an appeal from my March 5th order, after 30 days,

09:52:20 18  and now you've asked me to stay my ruling based on your appeal.

09:52:27 19      MR. GODFREY:  That is the second issue, Your Honor.

09:52:28 20      THE COURT:  That's the second issue.  But it's all

09:52:30 21  related because it's essentially the same test that you would have

09:52:34 22  to -- you know, it's essentially an injunction so --

09:52:39 23      MR. GODFREY:  Yes.

09:52:40 24      THE COURT:  -- it's all the same thing.  So we're back --

09:52:42 25  you know, this is all circular here.  We're back to my fundamental

EXHIBIT A

09:52:49  1   problem with what you're doing here, and that is you're either

09:52:52  2   asking me one of two things:  This is either a third motion for me

09:52:55  3   to consider this, second motion for reconsideration, which it

09:53:01  4   essentially is.  That's what you're really asking me to do.  Or if

09:53:05  5   you're not asking me to reconsider and change my mind, then you're

09:53:09  6   asking me to enjoin myself --

09:53:11  7            MR. GODFREY:  No.

09:53:12  8            THE COURT:  -- by enjoining Mr. Juneau.

09:53:14  9            MR. GODFREY:  This is a typical proceeding --

09:53:16 10            THE COURT:  If I enjoin Mr. Juneau, then he is in

09:53:19 11   contempt of my Court order which says he's got to --

09:53:23 12            MR. GODFREY:  No, Your Honor.

09:53:23 13            THE COURT:  And then if I sanction him for that, I think

09:53:26 14   BP would have to pay.  I think you would to have indemnify him,

09:53:30 15   right?

09:53:30 16            MR. GODFREY:  But Your Honor fully understands that we

09:53:33 17   are not asking for that.  What we're doing is we're asking for when

09:53:36 18   a Court rules and a party disagrees with a ruling, it is entitled

09:53:38 19   to seek a preliminary injunction if there is a substantial

09:53:42 20   likelihood of success on the merits that raises a serious question

09:53:44 21   of law according to the *Janus* case in the Fifth Circuit.  That is

09:53:47 22   what we have done.

09:53:48 23            As to the stay motion, that is an independent basis, and

09:53:51 24   it is typical, it is routine in this country in every circuit of

09:53:55 25   this country --

EXHIBIT A

09:53:55  1          THE COURT:  Oh, certainly, you have a right -- well, I'm

09:53:56  2   not going to say you have a right to appeal because I don't know.

09:53:58  3   But if you believe you have a right to appeal, you know, you can

09:54:01  4   take that up with the Circuit.  And then you can ask me to stay my

09:54:05  5   order, and I'll decide whether to stay it or not.  And then if I

09:54:10  6   decide not to stay it, you can take that to the Circuit.  That's

09:54:12  7   how it works.

09:54:13  8          I don't know why we're going through all these other

09:54:16  9   machinations.  It's a pretty simple straightforward way to approach

09:54:16 10   this.

09:54:22 11          MR. GODFREY:  Well, we have asked for a stay and an

09:54:23 12   injunction pending appeal.

09:54:24 13          THE COURT:  I know that.  But that's what not we're here

09:54:27 14   on this morning.  You filed that yesterday.

09:54:29 15          MR. GODFREY:  That's correct, we filed the Notice of

09:54:30 16   Appeal the night before, and here what we were seeking to do is

09:54:32 17   preserve the status quo.  Now, if Your Honor were willing to

09:54:35 18   reconsider it under Rule 62.1, we would embrace that.

09:54:38 19          THE COURT:  Reconsider what?

09:54:39 20          MR. GODFREY:  If you were willing to reconsider.  But we

09:54:42 21   did not see Your Honor as likely to --

09:54:44 22          THE COURT:  Wait.  Reconsider what?

09:54:47 23          MR. GODFREY:  The underlying merits of the dispute.  But

09:54:49 24   we did not see Your Honor as likely --

09:54:49 25          THE COURT:  That would be a second Motion For

EXHIBIT A

09:54:50  1  Reconsideration.

09:54:50  2      MR. GODFREY:  Yes, it would, Your Honor, and we do not

09:54:50  3  see that as likely for Your Honor --

09:54:51  4      THE COURT:  And then you have a tough hurdle there

09:54:53  5  because you have to show the law has changed, the evidence has

09:54:56  6  changed, you have to have not been able to make arguments that

09:54:59  7  you're making now.  And I don't think you can get there under that

09:55:02  8  hurdle.

09:55:02  9      MR. GODFREY:  Well, I understand that, Your Honor, which

09:55:04 10  is why we did not ask that.  I was responding to Your Honor's

09:55:07 11  suggestion about reconsideration.

09:55:07 12      THE COURT:  Okay.

09:55:08 13      MR. GODFREY:  So we narrowly filed this and drafted this

09:55:11 14  based upon our reading that we would be seeking a preliminary

09:55:14 15  injunction, and in addition we -- you know, I indicated in chambers

09:55:18 16  we would probably be filing a notice of appeal.

09:55:20 17      When we sat down for this on emergency hearing, it was

09:55:23 18  with the hope, but we understood that Your Honor obviously had

09:55:26 19  other commitments including the trial in this case, that we would

09:55:29 20  be able to have this heard before that.

09:55:31 21      But we are now here before --

09:55:32 22      THE COURT:  I gave you a pretty expedited hearing

09:55:35 23  considering.

09:55:35 24      MR. GODFREY:  You did.  And I'm not complaining about

09:55:36 25  that, Your Honor.

EXHIBIT A

09:55:37 1          THE COURT:  I mean, I'm going into a seventh week of a

09:55:40 2     trial that you're involved in -- or your client's involved in.

09:55:43 3          MR. GODFREY:  Yes, I am aware of that, Your Honor.  I am

09:55:45 4     across the street every day so I am fully cognizant of that.

09:55:50 5          THE COURT:  All right.

09:55:50 6          MR. GODFREY:  But we are not asking you to enjoin

09:55:52 7     yourself.  What we are asking to is to enjoin the continued

09:55:55 8     implementation of the BEL policy decisions.  We've laid out the

09:55:59 9     irreparable injury, and we do not agree that there are losses as

09:56:03 10    calculated by the agreement.  These are not losses whatsoever.  So

09:56:06 11    Your Honor's indicated you don't want to discuss the merits on that

09:56:09 12    this morning, so...

09:56:09 13         THE COURT:  Well, that may be a dis -- that is a

09:56:12 14    disagreement, obviously.

09:56:13 15         But getting back -- asking a different -- maybe the same

09:56:17 16    question in a different way:  As a matter of law, how can a claims

09:56:24 17    administrator be in breach of his contract if all he is doing is

09:56:32 18    applying it as he believes it should be applied and now as ordered

09:56:37 19    by the Court?  How can that possibly be a breach of contract?

09:56:42 20         MR. GODFREY:  Ultimately, if the Court of Appeals affirms

09:56:44 21    the March 5th order that claims interpretation adopted by the

09:56:52 22    claims administrator and affirmed by this Court that BP is wrong on

09:56:58 23    that, the claims administrator is correct, then it is not a breach

09:57:00 24    of contract and we recognize that.

09:57:02 25         But we are following Fifth Circuit guidance that suggests

EXHIBIT A

09:57:05  1    that when you are seeking to enforce your rights under a settlement

09:57:11  2    agreement, this is a procedure that you should follow.  That's why

09:57:14  3    I said it was a belt-and-suspenders.

09:57:16  4        But you are entirely correct that if the March 5th order

09:57:19  5    is the final word, either by the Court of Appeals or by this Court,

09:57:25  6    that in terms of the BEL policy decisions, then that is the

09:57:29  7    decision which will govern the claims administrator and BP as well.

09:57:33  8        We disagree with the decision respectfully.  We think it

09:57:36  9    rewrites the contract.  We think it awards people who have no

09:57:39 10    losses.  But you're entirely correct, Your Honor, I can't quarrel

09:57:43 11    with the question you've asked.  And we've indicated that in our

09:57:47 12    papers in response.

09:57:48 13        THE COURT:  All right.  Go ahead.  I know I've

09:57:50 14    interrupted you a great deal.  But that's what oral argument is

09:57:55 15    for, for judges to be able to interrupt lawyers.

09:57:57 16        MR. GODFREY:  Your Honor, I actually embrace that because

09:58:00 17    it helps to frame the issue.

09:58:02 18        I would like to ask the question about common ground.  I

09:58:06 19    know Your Honor has considered the merits, but I think, in fairness

09:58:09 20    to the Court, we need to understand what is actually happening in

09:58:14 21    the bowels of the administration.

09:58:15 22        Assume that a business claimant prepares monthly

09:58:20 23    financials that at year-end makes cumulative changes to those

09:58:24 24    financials, finds errors, finds that it had recorded things wrong,

09:58:27 25    makes cumulative errors dated December 31st relating to the earlier

EXHIBIT A

09:58:32  1    periods.  Happens every day.  Nothing wrong about that.

09:58:35  2         Time passes and now that business claimant seeks to make

09:58:38  3    a claim, claim in this settlement.  What financial information

09:58:42  4    should be used to calculate compensation under this agreement?  The

09:58:47  5    correct monthly financials, that is the monthly financials as

09:58:50  6    corrected at year-end, which everyone now knows what those should

09:58:55  7    be, or the monthly financials as prepared originally and as written

09:58:58  8    down, which we now know contained inaccurate, erroneous and even

09:59:01  9    false information?

09:59:02 10         Under the BEL policy decisions at issue, they are using

09:59:07 11    the incorrect data from the monthly financials as recorded, because

09:59:11 12    that's what they're required to do.  So in our declarations we have

09:59:18 13    examples of overbilling that were corrected at year-end.  We have

09:59:24 14    examples of negative revenue that were corrected at year-end.  We

09:59:31 15    have examples of erroneously recorded data that were corrected at

09:59:35 16    quarter or year-end, significant examples of Hall declaration, the

09:59:43 17    Crider declaration, the Finch declaration.

09:59:46 18         On page 26 and 27 of our brief, we outline two specific

09:59:49 19    examples of simple recordation errors where even under the

09:59:54 20    interpretation adopted by the claims administrator, if you use the

09:59:58 21    wrong data, you get the wrong result.  But the administration's

10:00:03 22    interpretation is whatever is recorded at the time is used now,

10:00:08 23    even when claimants point out that it's inaccurate.

10:00:11 24         That's what the declarations before the Courts reflect.

10:00:16 25    It's not a random event.

10:00:18  1    THE COURT:  That's not what we're talking about.  You may

10:00:20  2    have found some cases like that.  I am not saying, you know, when

10:00:23  3    you're talking about tens of thousands of cases.  But I am not

10:00:26  4    talking about the outliers.

10:00:28  5    What you're talking about is not where somebody made

10:00:31  6    mistakes and went back and corrected.  It's a larger issue than

10:00:35  7    that.  You're talking about a -- what this is at bottom is a

10:00:43  8    disagreement over whether revenues -- I am going to call it this,

10:00:46  9    you may have a different term, I know you use a fancy accounting

10:00:49 10    term, but I am calling it you want a smooth revenues and match

10:00:54 11    expenses to revenues, correct?

10:00:55 12    MR. GODFREY:  No.

10:00:56 13    THE COURT:  Well, that's -- I've been dealing with this

10:01:01 14    for months, Mr. Godfrey, and that's the only way I can understand

10:01:03 15    it.

10:01:03 16    MR. GODFREY:  We've never said the word "smooth."

10:01:06 17    THE COURT:  I know you didn't use the word "smoothing,"

10:01:09 18    but that's the effect of it.  You want to smooth out revenues and

10:01:12 19    match revenues -- somehow you want to match expenses.  I mean,

10:01:16 20    somehow you have a theory or a formula -- and I'm not sure what it

10:01:21 21    is because I think it's changed several times, but -- and, in fact,

10:01:24 22    as I recall when we met with you all, you couldn't explain how this

10:01:29 23    would work under BP's proposal.  It was kind of a moving target.

10:01:33 24    But you want to take, somehow take expenses that were

10:01:38 25    incurred in different periods and bring them up and apply it to

EXHIBIT A

10:01:42  1    when the revenue is received under -- would be somewhat similar to

10:01:47  2    accrual accounting, but you're not really using accrual accounting,

10:01:51  3    are you?

10:01:51  4          MR. GODFREY:  Accrual accounting is not required by the

10:01:53  5    agreement, Your Honor.

10:01:54  6          THE COURT:  Right, exactly.  So it's not accrual

10:01:56  7    accounting.  You don't want to use strict cash accounting, which of

10:02:00  8    course a lot of businesses, particularly small businesses, use,

10:02:04  9    including me when I was in business.  You use cash accounting,

10:02:08  10   perfectly legal.  IRS accepts it.

10:02:13  11         So you don't want to use cash accounting -- I mean, you

10:02:16  12   don't want to rely strictly on cash accounting and you don't want

10:02:21  13   to adopt pure accrual or have everybody would have to convert to

10:02:26  14   accrual accounting, and that, as you say, is not required by the

10:02:30  15   agreement.  So there's some animal, I am going to call it, that's

10:02:35  16   somewhere in between there.

10:02:36  17         I don't know what you call it.  I call it smoothing and

10:02:39  18   matching or whatever.  But that's some amorphous standard is what I

10:02:44  19   envision you're proposing.  I know you don't agree with that, but

10:02:47  20   that's the way I am viewing it.

10:02:49  21         So why don't you tell me -- I'm not talking about people

10:02:51  22   that made mistakes and have to correct.  I'm not talking about when

10:02:55  23   people made mistakes.  I'm talking about here's the way they keep

10:02:58  24   the books, here's the way revenues were received, here's the way

10:03:02  25   expenses were incurred or paid, how would you propose to do it?

EXHIBIT A

10:03:07  1        MR. GODFREY:  Your Honor, the language of the contract

10:03:09  2   says, "Sum the monthly revenues over the period and subtract the

10:03:11  3   corresponding variable expenses."  Those terms are well understood

10:03:15  4   by accountants, economists and financial professionals.  Monthly

10:03:18  5   revenue does not equal cash received and recorded in a month.

10:03:21  6        THE COURT:  That's assuming that the agreement called for

10:03:25  7   some standardized, generally accepted accounting methodology such

10:03:29  8   as accrual accounting, but you admit it does not.

10:03:33  9        MR. GODFREY:  No, Your Honor, it does not depend upon

10:03:37 10   accrual accounting.  The treatises all say, "Do not confuse cash

10:03:42 11   receipts with revenue."  If the suggestion is that revenue does not

10:03:46 12   mean what the treatises, the 19 of them that we've put before the

10:03:50 13   Court, the expert declarations mean, it means something else, then

10:03:53 14   it's not defined in the agreement that way.

10:03:55 15        That's a specialized definition that is unknowing to the

10:03:58 16   profession and it leads to absurd results.  You cannot calculate

10:04:02 17   lost profits --

10:04:03 18        THE COURT:  The results are only absurd if -- in your

10:04:08 19   view because you don't agree with how the outcome is coming out and

10:04:15 20   the way it's being interpreted.  But if the program, if the

10:04:20 21   agreement says, "This is how you calculate it," then that's how you

10:04:25 22   calculate it and that's a loss.  It doesn't matter if you would

10:04:28 23   consider it a loss in some other world, in some other sense, to me.

10:04:33 24   That's the way I'm looking at it.

10:04:33 25        MR. GODFREY:  Let me simplify it.

EXHIBIT A

10:04:35  1          THE COURT:  Okay.

10:04:36  2          MR. GODFREY:  This Court found a finding of this Court

10:04:41  3   that the program and the settlement adopts standardized,

10:04:45  4   well-recognized lost profit methodologies.  The terms used in the

10:04:51  5   contract, the five key terms -- revenue, expenses, corresponding,

10:04:59  6   comparable, profits -- have well-recognized and understood

10:05:04  7   definitions.

10:05:04  8          The only way you can determine -- and the stated purpose

10:05:08  9   of the agreement is to determine lost profits.  The only way you

10:05:11 10   can determine lost profits is by recording those terms.  They're

10:05:15 11   recognized and well understood definitions.

10:05:17 12          What the claims administrator has done is adopt unique

10:05:21 13   definitions that are not only rejected by the professions, but

10:05:25 14   cannot possibly meet the stated terms of the contract or satisfy

10:05:29 15   what the Court found in its findings as the parties presented to

10:05:33 16   it, which was standard, well recognized lost profit methodologies.

10:05:37 17          THE COURT:  Well, the claims administrator, Mr. Juneau,

10:05:39 18   is not, you know, is not there by himself in his office.  He has a

10:05:47 19   staff of accountants who works with him and apparently he relies on

10:06:00 20   and has relied on in how he applies this -- these accounting

10:06:11 21   issues, or deals with these accounting issues.

10:06:16 22          And so there are accountants who apparently, just like

10:06:26 23   lawyers, accountants sometimes disagree, amazingly enough, you

10:06:32 24   know.  And, for example, there's a declaration of Mr. Carroll, who

10:06:36 25   I am not sure if he is in Mr. Juneau's office or not, but just for

EXHIBIT A

10:06:41  1    example, but that, you know, disagrees with what you just said.

10:06:53  2    It's not as obvious as what you just said.

10:06:56  3          And secondly, as I recall, there's also something in this

10:07:01  4    record where that this was or should have -- the fact that you

10:07:07  5    would have businesses, certain businesses or professions that would

10:07:12  6    have swings of revenues and expenses up and down from month to

10:07:15  7    month or year to year is not something that would just suddenly be

10:07:20  8    recognized by BP.  That's obvious that that occurs.

10:07:26  9          And this was well-known, this was -- in fact, there's a

10:07:32 10    declaration in here somewhere where that was pointed out while the

10:07:37 11    settlement was being finalized, that this is something that you all

10:07:41 12    might want to look at, and nothing was changed in the settlement

10:07:47 13    agreement apparently.

10:07:47 14          So I have to assume that that is something that was known

10:07:50 15    or should have been known, should have been anticipated.  So that's

10:07:54 16    another question.  But, how is it that BP just came to the

10:07:58 17    realization late last year that this was a problem?

10:08:01 18          MR. GODFREY:  We didn't, Your Honor.  The agreement has a

10:08:03 19    standardized methodology where, depending upon the industry,

10:08:06 20    shouldn't make a difference.  If revenue is properly defined or

10:08:09 21    expenses are properly defined, it shouldn't make a difference.  I

10:08:13 22    am a little bit --

10:08:14 23          THE COURT:  These claims were being -- there was sampling

10:08:19 24    done, there were claims being paid since last summer.  This wasn't

10:08:24 25    raised or pointed out to the Court as a problem when we had our

EXHIBIT A

10:08:27  1   final fairness hearing in November, and it just became a problem in

10:08:32  2   December apparently.

10:08:33  3        MR. GODFREY:  We did not recognize what was taking place

10:08:35  4   in the facility, Your Honor.  The tests that took place in July did

10:08:39  5   not test anything other than assume the data is correct, run it

10:08:43  6   through the systems, and get the same result, as Mr. Crider's

10:08:47  7   declaration, paragraphs 89 through 93.

10:08:50  8        THE COURT:  Well, there are other declarations that

10:08:51  9   disagree with that.

10:08:52 10        MR. GODFREY:  But, Your Honor, let me try to respond to a

10:08:56 11   number of your points.  I've taken up, I think, more than my

10:09:00 12   20 minutes, but I --

10:09:01 13        THE COURT:  I've given you a little extra time.

10:09:03 14        MR. GODFREY:  Thank you.  Point one, the example of the

10:09:07 15   corrections are not outliers.  That is a common, common occurrence

10:09:13 16   in the construction industry in particular.  Those aren't outliers.

10:09:17 17   The failure to adjust or correct for that is a direct result of the

10:09:21 18   wooden adherence to the notion whatever is recorded at the time is

10:09:25 19   used at the time even though we know that the data is incorrect.

10:09:28 20   So that's not an outlier, Your Honor, that's a common occurrence.

10:09:33 21        Number two:  The leading accounting professor in this

10:09:35 22   country, Roman Weil, and we submitted his declaration, he points

10:09:39 23   out that the interpretation that leads to this doesn't produce a

10:09:43 24   variable profit analysis.  And you would say, well,

10:09:46 25   "Mr. Godfrey" --

10:09:46  1      THE COURT:  Is that one of the new declarations that you

10:09:48  2  submitted?

10:09:48  3      MR. GODFREY:  No, that was a prior declaration, but we've

10:09:51  4  had similar declarations before.

10:09:52  5      Mr. Carroll doesn't give grand -- or he has some very

10:09:55  6  general statements, but he doesn't get grand to understand exactly

10:09:59  7  what's going on, and we can file something about that if the Court

10:10:01  8  wanted, but I doubt you want it.

10:10:05  9      THE COURT:  I don't want any more declarations, I can

10:10:05 10  tell you that.

10:10:05 11      MR. GODFREY:  I was going to say, I'm hesitant to even

10:10:05 12  raise the issue.

10:10:07 13      THE COURT:  Or not even another page of brief.

10:10:09 14      MR. GODFREY:  Fair enough.  But you go back to what was

10:10:12 15  the purpose of the agreement, to determine lost profits.  This

10:10:16 16  isn't some unique or bizarre or unknown definition.  The terms here

10:10:21 17  understandably lead to either an absurd result where people are

10:10:26 18  getting money that has nothing to do with the profits they made

10:10:28 19  based on net cash flow differences, or where they're an accrual

10:10:34 20  basis or cash basis taxpayer, but the expenses and the revenue

10:10:38 21  match because of the nature of their business, it's a proper lost

10:10:41 22  profits calculation.

10:10:43 23      One of the examples in the plaintiff's brief used this

10:10:47 24  week, given a lot of press, was the alligator farm.  Read all about

10:10:51 25  it.  Problem is in 2010, it was the most profitable year by almost

EXHIBIT A

| | | |
|---|---|---|
| 10:10:56 | 1 | five times in its history.  2011 was the second most profitable |
| 10:11:00 | 2 | year.  And yet it gets an award for alleged lost profit, not based |
| 10:11:04 | 3 | upon the difference between revenue and corresponding variable |
| 10:11:08 | 4 | expenses in the two periods, but based upon the difference of |
| 10:11:12 | 5 | differential cash flows, which is not what the agreement provided. |
| 10:11:17 | 6 | THE COURT:  What about Chef Folse? |
| 10:11:20 | 7 | MR. GODFREY:  That's a different issue. |
| 10:11:22 | 8 | THE COURT:  Is BP seriously saying he's not a seafood |
| 10:11:25 | 9 | processor and not eligible for an award, or is it a BEL issue? |
| 10:11:30 | 10 | MR. GODFREY:  It's a different issue, Your Honor.  It's a |
| 10:11:32 | 11 | causation passing issue, number one, and it's a location of |
| 10:11:34 | 12 | headquarters issue, number two, as I understand it. |
| 10:11:37 | 13 | THE COURT:  Well, all I know is what I read in the media, |
| 10:11:40 | 14 | and that may not be fair to ask you about -- |
| 10:11:40 | 15 | MR. GODFREY:  There were some -- |
| 10:11:43 | 16 | THE COURT:  -- but it said he was denied, and he's shown |
| 10:11:45 | 17 | with his little BP sticker on his chef's vest -- |
| 10:11:45 | 18 | MR. GODFREY:  I understand what -- |
| 10:11:48 | 19 | THE COURT:  -- and now he's saying he's not -- he is |
| 10:11:51 | 20 | being disqualified because he doesn't process seafood, which |
| 10:11:55 | 21 | doesn't make a lot of sense to most people down here. |
| 10:11:57 | 22 | MR. GODFREY:  Well, remember the test is a revenue |
| 10:11:59 | 23 | causation test. |
| 10:12:00 | 24 | THE COURT:  No, I'm just talking about why he is not a |
| 10:12:03 | 25 | seafood processor.  That sounds strange to me. |

EXHIBIT A

10:12:05  1        MR. GODFREY:  Well, I have to think about it.  Let me be

10:12:09  2   blunt about something.  I'm caught between the sword and the shield

10:12:12  3   of confidentiality here, the Rule 408 stuff.  There's a lot of

10:12:15  4   stuff I could tell the Court about negotiations otherwise that are

10:12:18  5   quite different than the presentation being made.  But I am bound

10:12:20  6   by the Rules, I think, of the Court in terms of 408 and other

10:12:25  7   things.  The same with the facility.

10:12:26  8        I think I can say this about the chef.  I think I can say

10:12:28  9   that he has designated himself on tax returns something different

10:12:31 10   than what he claims to be now.  I think people can --

10:12:32 11        THE COURT:  I read the declaration of his attorney.

10:12:35 12        MR. GODFREY:  I think I can say that there's a question

10:12:37 13   about where his headquarters is located, which determines about

10:12:40 14   whether or not he can pass the causation test.  I am not an expert

10:12:43 15   on that claim.  I'm a data-driven person, as the Court knows, and I

10:12:47 16   spent time on the alligator farm claim this week.

10:12:49 17        So I don't know all of the answers.  But in terms of what

10:12:51 18   the issue is, it seems to be a little bit unfair to have a

10:12:54 19   confidential process where the claims information is submitted

10:12:57 20   confidentially and then stuff is spread of record selectively, and

10:13:00 21   I am bound by the confidentiality provisions but my colleagues to

10:13:04 22   the left are not.  It's a fundamentally unfair proposition.

10:13:06 23        THE COURT:  I don't know that they spread that to the --

10:13:09 24   Chef Folse, I imagine, spread that.

10:13:12 25        MR. GODFREY:  They put the affidavit in before the Court.

EXHIBIT A

10:13:14  1      THE COURT:  I need to give the other side a chance to

10:13:17  2  respond because I have a time limit to get out of here today.

10:13:20  3      MR. GODFREY:  I appreciate the Court's time.  I would ask

10:13:22  4  that the Court enter the injunction, fictitious awards are being

10:13:24  5  awarded.  And I appreciate the Court's time.  Thank you very much.

10:13:26  6      THE COURT:  All right.  Mr. Stanley.

10:13:37  7      MR. STANLEY:  Good morning, Your Honor.  Rick Stanley

10:13:39  8  here for Pat Juneau and for the settlement program, for what I hope

10:13:43  9  is a cameo appearance in this matter.

10:13:47 10      Let me first talk about the Motion to Dismiss, and I'm

10:13:51 11  not going to spend a whole lot of time on that.  Our position is

10:13:55 12  pretty simple.  First, we don't believe that BP has alleged facts

10:14:00 13  to support a claim for relief in this Court, and I believe that the

10:14:04 14  argument I just heard confirms that.

10:14:06 15      And second, that if there is a possible claim for relief,

10:14:10 16  that judicial immunity would apply.

10:14:14 17      First, if I heard Mr. Godfrey correctly, he stated that

10:14:18 18  it wouldn't be until the Fifth Circuit affirmed -- or, rather,

10:14:21 19  reversed this Court's March 5th ruling that there would be a

10:14:25 20  misinterpretation to the settlement agreement.  The problem is that

10:14:28 21  Mr. Juneau was sued before any appeal was lodged.  Mr. Juneau was

10:14:33 22  not a party to anything on March 5th, 2013.

10:14:39 23      THE COURT:  But you're not arguing the Court doesn't

10:14:41 24  have -- I wouldn't have jurisdiction or authority to enjoin him or

10:14:47 25  if I found he was wrongly interpreting or applying the contract?

EXHIBIT A

10:14:53  1          MR. STANLEY:  No, sir.  I am suggesting that the

10:14:54  2    complaint is unnecessary.  In fact, I am here to say that whatever

10:14:58  3    this Court decides, Mr. Juneau will do.  He doesn't take a position

10:15:03  4    with respect to who is right, who is wrong.  Whatever this Court

10:15:07  5    directs, Mr. Juneau will faithfully follow this Court's directive.

10:15:12  6    But we don't think that a complaint and injunction was the

10:15:15  7    appropriate way to proceed, and we don't believe the facts that

10:15:18  8    have been alleged allege a claim for relief because, essentially,

10:15:22  9    it's as Your Honor pointed out, he is simply accused of following

10:15:27 10    the ultimate process that was provided for in the settlement

10:15:30 11    agreement and the ultimate order of this Court.  We don't think

10:15:33 12    those facts support a claim for a breach of any contract.

10:15:36 13          But second, we're also asking for it to be dismissed on the

10:15:40 14    grounds of immunity.  And here is why we think that matters:

10:15:46 15    Mr. Juneau is engaged in quasi judicial functions trying to

10:15:51 16    administer this settlement agreement.  There is no doubt that as he

10:15:55 17    grants some claims and denies others, someone is going to be

10:15:58 18    displeased.  If there is a precedent that the thing to do is to

10:16:03 19    file a complaint against Mr. Juneau and just sue him every time

10:16:07 20    someone disagrees with a determination that he makes of eligibility

10:16:11 21    or something else, then we have just created an entire new set of

10:16:16 22    litigation against the claims administrator that I don't think has

10:16:21 23    any place anywhere.  And I think the immunity doctrines that we

10:16:26 24    have pointed out in our briefs fully support the fact that

10:16:29 25    Mr. Juneau is immune from those claims because the authority he is

EXHIBIT A

10:16:33  1    acting under is derived from the order of this Court.

10:16:37  2         THE COURT:  Hypothetically, if he was -- let's see how I

10:16:43  3    can put this.  I guess the other side argues that he is not immune

10:16:52  4    because he is just performing a ministerial administrative

10:16:56  5    function, he is not really exercising a judicial function -- quasi

10:17:01  6    judicial function.  And beyond that, there's no judicial immunity

10:17:09  7    for prospective injunctive relief.

10:17:14  8         MR. STANLEY:  We think both of those points are

10:17:17  9    incorrect.  We think, as we pointed out in our reply brief, the

10:17:20 10    authority they have for saying that prospective injunctive relief

10:17:24 11    is not available was a Supreme Court case that was legislatively

10:17:28 12    overruled in the context of 1983 actions.  As the law stands today

10:17:33 13    in Bivens actions and in 1983 actions, injunctive relief is barred

10:17:38 14    by judicial immunity.

10:17:39 15         THE COURT:  We don't have a Bivens action here or a 1983

10:17:42 16    action.

10:17:43 17         MR. STANLEY:  We don't.  And what we have argued by

10:17:45 18    analogy is that the doctrine of judicial immunity which protects

10:17:50 19    decision makers like Mr. Juneau, whether it be a trustee or

10:17:55 20    receiver or anybody of the sort, should apply in this case.  We

10:17:59 21    can't find a case directly on point, Your Honor.  We looked.  But

10:18:04 22    we think that the functions that he is being asked to perform,

10:18:08 23    interpret the agreement when disputes arise, state eligibility for

10:18:14 24    claims, decide whether someone is eligible or not eligible for a

10:18:18 25    claim, handle disputes in the first instance about the agreement to

EXHIBIT A

10:18:23  1    see if some kind of accommodation can be reached, those are all

10:18:29  2    quasi judicial.

10:18:29  3         Whether you call him a special master or don't call him a

10:18:32  4    special master, we don't think is here or there.  We think the

10:18:35  5    function he is performing would entitle him to immunity from the

10:18:41  6    suit.

10:18:41  7         I am going to start and finish by saying that he is

10:18:44  8    absolutely subject to your authority at all times.  If he deviates

10:18:48  9    from what this Court orders him to do, he could be held in

10:18:52 10    contempt, he could be dismissed; but I don't think the remedy is

10:18:55 11    for someone to sue him, whether it be the one party to the

10:18:59 12    agreement or another party to the agreement or a disappointed

10:19:03 13    claimant.

10:19:04 14         And so that's our position on the motion to dismiss.  We

10:19:07 15    do think it matters as a matter of policy.  There are MDLs all over

10:19:11 16    the country that have to use people like Mr. Juneau to adjudicate

10:19:17 17    complicated claims.  We have 150,000 plus claims here.  The Courts

10:19:22 18    would grind to a halt if all of those claims had to be processed

10:19:26 19    through a Court.  So to have a precedent that, gee, the thing to do

10:19:31 20    when your claims process isn't working the way you wanted it to is

10:19:35 21    to sue the claims administrator to get the Court to intervene, we

10:19:42 22    think is the wrong way to go.

10:19:43 23         Let me move quickly to the response to the preliminary

10:19:47 24    injunction, and I will begin and end this argument also by saying

10:19:50 25    all Mr. Juneau wants to do is what this Court directs him to do.

EXHIBIT A

10:19:54  1    He wants to interpret this and move this process forward according
10:19:57  2    to the settlement agreement.  He did not draft it.  He did not
10:20:01  3    participate in the negotiation of it.  He really has no position
10:20:05  4    about the wisdom of the settlement agreement or how it came to be.
10:20:09  5    He just wants to do his job as claims administrator.
10:20:12  6         The only points that I really want to address for the
10:20:16  7    Court are procedural in nature.  There are two procedural points,
10:20:22  8    and I want to be sure the record is clear.  There is a contention
10:20:24  9    that BP claims it had no input on Mr. Juneau's decision.  That is
10:20:29 10    repeated a couple of times in the brief.
10:20:32 11         First of all, Your Honor, we think that the record belies
10:20:35 12    that claim.  There was a blind test of 62 blinded claims in the
10:20:40 13    summer to see how they came out.  On September 25th we put in the
10:20:45 14    record Mr. Juneau -- Mike Juneau sent a hypothetical to both
10:20:49 15    parties saying, "Do you understand that there are instances under
10:20:53 16    the way this settlement program is going to be applied where you
10:20:57 17    could have causation met, even though we all know, looking at it,
10:21:03 18    that it's not caused by the spill?"  And both parties said, "We
10:21:07 19    understand that.  We understand that's going to happen in this
10:21:09 20    settlement agreement."  And so that was asked to BP in a specific
10:21:14 21    hypothetical and a specific response was given.
10:21:17 22         On September 28th, BP sent four questions over saying,
10:21:22 23    "We want to understand how you accountants are looking at these
10:21:25 24    claims.  How are you booking these revenues?  What are you doing
10:21:28 25    with cash basis folks?"  On October 2nd there was a conference call

EXHIBIT A

10:21:33  1  to address those claims.  BP participated, BP's questions were

10:21:38  2  answered.

10:21:40  3          In terms of the right of review, Mr. Juneau's office

10:21:46  4  issues a certificate of eligibility.  At that point, both sides are

10:21:50  5  entitled to look at that and appeal his determination.  And if they

10:21:55  6  feel that there is an erroneous determination, they can argue that

10:22:00  7  to this Court and bring that claim up.  In fact, of the 201 claims

10:22:06  8  listed in Exhibit B to their brief by our count, 70 of those have

10:22:11  9  been appealed.

10:22:12  10         THE COURT:  Actually, I think they'd appeal first to an

10:22:15  11  appeal panel --

10:22:16  12         MR. STANLEY:  Correct.

10:22:17  13         THE COURT:  -- appointed by the Court, and then there's a

10:22:20  14  discretionary appeal to the Court.

10:22:23  15         MR. STANLEY:  There is a review.

10:22:24  16         THE COURT:  Right.

10:22:26  17         MR. STANLEY:  And they have all of the information that

10:22:28  18  they could want to decide whether to appeal those eligibility

10:22:31  19  determinations, so they do have input.

10:22:35  20         And we also want to point out to the Court that, with

10:22:39  21  respect to the process that's being suggested, the first time that

10:22:42  22  process was suggested by BP, that four-step process, was

10:22:47  23  January 8th, 2013.  It was the first time we understood or were

10:22:52  24  told exactly how they were reading the agreement and what they

10:22:56  25  thought that agreement called for in terms of process.  And within

EXHIBIT A

10:22:59   1    one week, Mr. Juneau made his policy announcement and then, as Your

10:23:04   2    Honor is familiar, everything proceeded from there.

10:23:07   3        THE COURT:  Am I correct that Mr. Juneau didn't make this

10:23:15   4    policy, didn't issue this policy announcement solely on his own;

10:23:19   5    that is, without consulting with people that work for him, I'm

10:23:23   6    assuming?

10:23:23   7        MR. STANLEY:  You're absolutely correct.  No, he had the

10:23:26   8    position paper of the PSC from December 16th, BP's response on

10:23:31   9    January 8th, he met with his team, considered all of it, and issued

10:23:35  10    his policy announcement.  And in fact, made a statement in there

10:23:39  11    that there are three instances where they would look at information

10:23:43  12    and ask the claimant to correct it if they thought there was an

10:23:46  13    error.

10:23:47  14        THE COURT:  So there are instances where, under some

10:23:49  15    circumstances, the claims program or claims administrator will ask

10:23:56  16    people to correct misinformation in the financials?  Am I correct

10:24:04  17    about that?

10:24:04  18        MR. STANLEY:  That is correct.  In fact, the policy

10:24:06  19    announcement uses the word "error," and if there is an error and

10:24:09  20    it's identified, they will ask the claimant to correct it.  That's

10:24:13  21    the policy that they use.

10:24:14  22        THE COURT:  Okay.

10:24:15  23        MR. STANLEY:  Also, Your Honor, there is some implication

10:24:19  24    that the claims administrator used some unusual process in this

10:24:24  25    instance and did not follow the pattern that existed for other

EXHIBIT A

10:24:28 1    policy interpretations.  We don't believe that's the case.  The

10:24:32 2    claims administrator simply did not have a question about the way

10:24:37 3    these claims were being viewed because, frankly, the settlement

10:24:42 4    program accountants and Mr. Juneau thought it was fairly clear what

10:24:45 5    the agreement said and how to do it.

10:24:48 6        It was only after BP raised the question about do you

10:24:54 7    think you're doing it the right way, that the question was put

10:24:57 8    forward.  So Mr. Juneau didn't have the question, the question came

10:25:01 9    from one of the parties to the settlement agreement, which is why

10:25:03 10   this didn't -- wasn't initiated in the first instance from

10:25:08 11   Mr. Juneau.

10:25:09 12       And then finally, Your Honor alluded to the fact that, as

10:25:12 13   we discovered as preparing for this hearing, that there is an

10:25:15 14   April 4, 2012, memorandum where the program accountants were asked

10:25:19 15   to review the settlement agreement in advance and alerted both

10:25:24 16   sides to the fact that using a short time period to assess

10:25:29 17   compensation might lead to a matching problem between revenues and

10:25:34 18   expenses; and that was pointed out to both sides.  That was not a

10:25:38 19   memorandum Mr. Juneau even had until responding to the preliminary

10:25:43 20   injunction motion in this matter.

10:25:45 21       Unless Your Honor has any questions, I'll sit down.

10:25:49 22       THE COURT:  Thank you very much.  All right.  Mr. Herman.

10:25:53 23       MR. HERMAN:  Thank you, Your Honor.  Steve Herman for the

10:25:58 24   class.  I have a short presentation, which I think I am going to

10:26:01 25   make a lot shorter in light of the Court's comments.  Provided a

EXHIBIT A

10:26:05  1    couple of copies to Ben and copies to all counsel.

10:26:09  2         Very quickly.  It occurs to me that BP sued the claims

10:26:16  3    administrator claiming *ultra vires*.  Don't even know what that

10:26:19  4    means.  Had to look it up in *Black's Law Dictionary.*  They're

10:26:23  5    saying he's trying to do something the Settlement Agreement doesn't

10:26:26  6    allow.  As I think Your Honor noted, there is a process for issues

10:26:29  7    of disagreements that can't be unanimously resolved by the claims

10:26:33  8    administration will be referred to the Court for resolution.  Which

10:26:36  9    Court?  This Court.  "The Court shall mean the United States

10:26:40 10    District Court for the Eastern District of Louisiana, Judge Carl

10:26:43 11    Barbier presiding."

10:26:45 12         And I thought Mr. Godfrey said Your Honor and Your Honor

10:26:49 13    alone; but as Your Honor pointed out, the whole reason we're here

10:26:53 14    today is to go to the Fifth Circuit.  And I would submit that if

10:26:58 15    anybody is *ultra vires* of the Settlement Agreement it's BP, not the

10:27:02 16    claims administrator.

10:27:03 17         Your Honor has seen a lot of this before, so I won't

10:27:06 18    belabor the points, but there is one thing I do want to address

10:27:10 19    very quickly, about the third bullet point from the bottom because

10:27:14 20    this is something Mr. Godfrey touched upon.  A lot of these claims

10:27:18 21    that they are now attacking are based on annual revenue.  And

10:27:21 22    Mr. Godfrey says -- I think he was talking about the gator farm.

10:27:24 23    Well, their annual profit in 2010 is greater than it was in the

10:27:28 24    past.  Well, BP --

10:27:30 25         First of all, it was known to all of the parties that

EXHIBIT A

10:27:33  1    that might happen, that's why you focused on a three-month period.

10:27:38  2    And this really had a very easy fix.  I don't know necessarily

10:27:42  3    would have agreed to it, but BP never even suggested, "Why don't we

10:27:47  4    say you have the causation test, but as a secondary test, if your

10:27:51  5    annual revenue is bigger in 2010 by some margin than it was in the

10:27:54  6    past, we're just going to say that doesn't pass causation."  That's

10:27:59  7    nowhere in the document, was never discussed, never suggested by

10:28:02  8    BP.  But now, in these claims that they're attacking, that's one of

10:28:06  9    the main arguments that they use.

10:28:09  10           Just very briefly, this is a blown up Louisiana,

10:28:12  11   Mississippi, and Alabama.  Goes all the way to Arkansas --

10:28:17  12           THE COURT:  Let me ask you this.

10:28:20  13           MR. HERMAN:  Yes, sir.

10:28:22  14           THE COURT:  Are the vast majority of the claims that are

10:28:24  15   at issue -- I know, according to what I've understood and the

10:28:29  16   number of times we've dealt with this issue, largely fall within

10:28:35  17   three industries or the three categories.  And those are:

10:28:38  18   Professional services, which would be attorneys, engineers, so

10:28:41  19   forth; professional services, agriculture, and construction.

10:28:48  20   Correct?

10:28:48  21           MR. HERMAN:  Correct, Your Honor.

10:28:49  22           THE COURT:  And some of the examples that I know -- I am

10:28:52  23   not suggesting all of them by any means, but a number of the

10:28:55  24   examples they cite are, like, way up by the Arkansas border.

10:28:59  25           MR. HERMAN:  Right.

EXHIBIT A

10:29:00  1          THE COURT:  But is their argument limited to people that
10:29:04  2   are remote we'd say from the Gulf Coast or would this -- does this
10:29:08  3   issue apply even to people along the Gulf Coast?
10:29:11  4          MR. HERMAN:  Well, as Your Honor mentioned, it's kind of
10:29:14  5   a moving target.  I initially thought it was just limited to those
10:29:17  6   three industries.  They seem to be suggesting at certain points in
10:29:21  7   time that it should apply to everyone across the board.  But the
10:29:24  8   reason I backed up to the previous thing is they never suggested
10:29:28  9   that these three types of services -- these types of industries be
10:29:33 10   excluded from the agreement or that they operate under a different
10:29:35 11   framework.
10:29:36 12          And there was a lot of discussion about construction
10:29:37 13   companies in particular because real estate developers were
10:29:40 14   excluded, and there was a lot of thought to we need to make sure
10:29:43 15   that construction companies, general contractors, subcontractors
10:29:46 16   are included, an intentional decision by BP to put them in the
10:29:50 17   class and include them in the settlement as opposed to real estate
10:29:54 18   developers.
10:29:54 19          THE COURT:  And obviously, both parties intended and did
10:29:58 20   put the entire states of Louisiana, Mississippi, and Alabama in the
10:30:02 21   settlement, in the class.
10:30:04 22          MR. HERMAN:  Correct, Your Honor.  And now they have your
10:30:06 23   final judgment which gives them a class-wide release for this
10:30:10 24   entire area.  I didn't have time to specifically correctly
10:30:13 25   delineate the zones that have presumptions in them, but they're

EXHIBIT A

10:30:16  1   really along I-10.  So everything above I-10, 90 percent probably

10:30:21  2   of this class, is a Zone D claim, what we call a Zone D claim, and

10:30:26  3   that has the exact same causation structure -- the percentages are

10:30:31  4   different, but the causation structure that BP agreed to, the

10:30:35  5   objective criteria how you would decide if there was a loss caused

10:30:39  6   by the spill, is the same structure in Zone D for 90 percent of the

10:30:44  7   cases as it is for the people along the Coast, and that's what they

10:30:47  8   agreed to.

10:30:47  9        THE COURT:  Generally a so-called V test, your revenue

10:31:09 10   goes down and goes back up; or a modified V, and two or three

10:31:14 11   different ways you can prove that.

10:31:15 12        MR. HERMAN:  Correct, Your Honor.

10:31:16 13        THE COURT:  But the difference, as I appreciate it, it's

10:31:19 14   a higher standard the farther you get away from the coast because

10:31:25 15   there has to be a greater deviation in your revenue in other words?

10:31:29 16        MR. HERMAN:  Right.  You have to have a sharper V.  If

10:31:32 17   you're in Monroe, you need to have a V; if you're down south, you

10:31:35 18   maybe only need to have a U.

10:31:37 19        THE COURT:  Okay.

10:31:39 20        MR. HERMAN:  So all of this is set forward in our briefs

10:31:44 21   and I won't belabor it.

10:31:46 22        But there are three kinds of chronologies that sometimes

10:31:49 23   get overlapped, but they're a little bit separate but they kind of

10:31:52 24   mix together.  One chronology is this matching/smoothing issue

10:31:55 25   which I think really is the issue before Your Honor today, or BP

EXHIBIT A

10:32:01 1   wants it to be.  There is also another chronology that went along,

10:32:04 2   and you'll see a lot of this in the briefing, well you already

10:32:07 3   have, on monthly P&Ls.  And the issue there is that with that issue

10:32:12 4   BP took the exact contrary position because they said you shouldn't

10:32:16 5   match or smooth, you should use the actual monthly P&Ls that were

10:32:21 6   created.

10:32:21 7        Then you have this the third issue, this is what we call

10:32:23 8   the alternative causation issue.  And this is something that

10:32:27 9   Mr. Stanley brought up.  There's lots of things in this chronology,

10:32:31 10  and we briefed it extensively, but this is just trying to touch the

10:32:36 11  salient points.  But this is the e-mail from Mr. Juneau to the

10:32:39 12  parties in September.  "As to BEL claims, once a claimant's

10:32:44 13  financial records satisfy the causation standard set out in

10:32:47 14  Exhibit 4B, does the Settlement Agreement mandate and/or allow the

10:32:51 15  claims administrator to separate out losses attributable to the oil

10:32:55 16  spill vs those that are not?"

10:32:57 17       "Stated another way, once a claimant passes the causation

10:33:01 18  threshold, is the claimant entitled to recovery of all losses as

10:33:05 19  per the formula set out in Exhibit 4C, or is some consideration to

10:33:10 20  be given so as to exclude those losses clearly unrelated to the

10:33:14 21  spill?"

10:33:14 22       Now, he puts in a hypothetical.  "A small accounting

10:33:18 23  corporation firm is located in Zone B."  Accounting corporation is

10:33:22 24  a professional services corporation, so he is giving them a hypo

10:33:26 25  for one of the exact industries that BP is now attacking.  "They

EXHIBIT A

10:33:30  1   meet the V-shaped curve causation test.  The explanation for the
10:33:33  2   drop is that one of the three partners went out on medical leave,
10:33:38  3   income went back up six months later when the partner comes back.
10:33:42  4   Applying the compensation formula under Exhibit 4C, the accounting
10:33:45  5   firm can calculate fairly substantial loss.  Is that full loss
10:33:48  6   recoverable?"

10:33:49  7          Here is the answer, response from BP counsel, on their
10:33:53  8   letterhead with the little sundial.  "If proper application of the
10:33:57  9   methodology with accurate financial data yields a determination
10:33:59 10   that causation is satisfied, BP agrees with class counsel that all
10:34:04 11   losses calculated in accordance with Section 3.3 and Exhibits 4C
10:34:09 12   and 19 of the Settlement Agreement are presumed to be attributable
10:34:12 13   to the oil spill."  They kind of restate that.  Then they say,
10:34:16 14   "Nothing, not causation framework or compensation framework,
10:34:19 15   provides for an offset where the claimant firm's revenue declined
10:34:23 16   (and recovery, if applicable) satisfies the causation test, but
10:34:28 17   extraneous non-financial data is indicative that the decline was
10:34:32 18   attributable to a factor wholly unrelated to the oil spill.  Such
10:34:37 19   false positives are inevitable, concomitant of an objective
10:34:41 20   quantitative database test."

10:34:44 21          So then skipping ahead a couple of months, now the claims
10:34:47 22   administrator has issued a formal policy.  BP is coming to the
10:34:51 23   court, along with class counsel, trying to get the release for that
10:34:54 24   whole area that we saw.  And they submit joint proposed statements
10:34:58 25   on November 19th.  "Once the causation tests are satisfied, all

EXHIBIT A

10:35:02   1   revenue and variable profit declines during the compensation period

10:35:06   2   are presumed to be caused entirely by the spill, with no analysis

10:35:12   3   of whether such declines were also traceable to other factors

10:35:15   4   unrelated to the spill."  And they cite two BP experts, Fishkind

10:35:21   5   and Sharp who submitted declarations in support of the settlement.

10:35:25   6   So they're kind of going along, pulling everybody along, trying to

10:35:30   7   get the class approved, some people have called it a "bait and

10:35:34   8   switch" or "laying in wait" or whatever you want to say, but the

10:35:38   9   reality is this is all the way November 19th.

10:35:40  10       Your Honor will recall we appeared here in this very

10:35:43  11   courtroom on December 12th to talk about the nonprofits and this

10:35:46  12   issue came up, this issue of alternative causation.  And Your Honor

10:35:49  13   from that very bench asked BP counsel:  Do you agree with the

10:35:54  14   claims administrator's policy that once you satisfy causation under

10:35:58  15   the objective formula in the Settlement Agreement, all of the

10:36:01  16   losses under the compensation framework are deemed to be caused by

10:36:06  17   the spill and are recoverable?"  And BP's counsel, I think they

10:36:09  18   were over there at the time, said, yes, Your Honor, we agree with

10:36:12  19   that.  And Your Honor confirmed that, confirmed that agreement.

10:36:16  20       Well, now, here we are four months later, or five months

10:36:19  21   later --

10:36:20  22       THE COURT:  Let me ask you this, you may be getting to

10:36:21  23   this.  But when is the first time that you knew, class counsel were

10:36:27  24   alerted that BP believed there was a problem, you know, voiced the

10:36:34  25   complaint that they're voicing now in fact?  Was it after or before

EXHIBIT A

10:36:43  1    the, let's talk about the November 8th fairness hearing, final

10:36:46  2    fairness hearing, for example?

10:36:48  3            MR. HERMAN:  Well, I have to answer this in a couple of

10:36:51  4    ways.  I had some indication of their -- of what happened in

10:36:57  5    October because I think I was on that conference call that

10:37:00  6    Mr. Stanley referred to where they were asking the accountants

10:37:03  7    questions.  As far as I knew for awhile they were okay with that.

10:37:08  8    They weren't raising it.

10:37:09  9            However, around the time of Thanksgiving, about, I don't

10:37:14 10    know, a week or two after this, not on the matching/smoothing issue

10:37:20 11    but on alternative causation, as Your Honor will recall --

10:37:23 12            THE COURT:  Did that deal with the nonprofits?

10:37:26 13            MR. HERMAN:  Well, it came up around that same.  Really

10:37:28 14    didn't have anything to do with it, but just happened to come up at

10:37:31 15    the same time.

10:37:31 16            And the way it came up to me was right around

10:37:34 17    Thanksgiving, I think we had a conference call with BP counsel from

10:37:37 18    Thanksgiving, from home, because they were objecting to the

10:37:43 19    supplemental information program and they were saying that if a

10:37:47 20    claimant subjectively didn't know or believe that they had a loss

10:37:53 21    caused by the spill that it was "fraudulent" to file a claim.  We

10:37:57 22    got in a huge disagreement about that because of things, of

10:38:00 23    statements like they have made here of their answer.

10:38:03 24            So when it came up to Your Honor, I think everybody,

10:38:06 25    well, at least class counsel was appreciative that the claims

EXHIBIT A

administrator brought it up because they said, wait, BP keeps

saying that you don't look at alternative causation, but now

they've objected to this advertisement saying that it's going to

encourage "fraudulent" claims.  Now, these are claims that they now

say are "fictitious," some other time they said they were "absurd".

These are the same claims that they agreed would be compensated

under objective formula.

So when we were before Your Honor on the nonprofits, we

said let's get the alternative causation issue done once and for

all, and they agreed and Your Honor confirmed that.  Nevertheless,

here we are again a few months later with a slightly different

motion for reconsideration, purportedly on matching/smoothing, but

what they're really talking about in a lot of these cases is

alternative causation.

And not only that, the big problem that the class has

right now is that BP is now appealing virtually everything.  But

what they're saying in their appeal, and these are the appeals that

Your Honor mentioned to the appeal panelists within the settlement

program, not to the Fifth Circuit.  They're going to these appeal

panelists and they're saying, the award is being driven not by a

decrease in economic activity after the spill, but rather -- and

we've protected the confidentiality, we didn't want to put too much

detail -- but the bottom line is by some alternative cause during

the post compensation period.  Claimant's own economic data shows

that claimant is not a class member and thus may not file a claim

10:39:39 1   or receive compensation under the Settlement Agreement.  This is

10:39:42 2   the position that BP is taking right now.

10:39:44 3        And here is another example.  This is a better example

10:39:48 4   frankly.  I understand, I can't confirm, but I understand that

10:39:51 5   there's hundreds, maybe even thousands of these things being

10:39:55 6   appealed and being held up right now.  But this is what they say.

10:39:58 7   Again, it's unclear what basis this type of company -- I can

10:40:02 8   probably tell you, but I was being overly cautious -- that some

10:40:05 9   type of company can assert a spill related loss, a necessary

10:40:09 10  prerequisite to class membership and recovery.  There's no

10:40:12 11  indication in the record as to what possible basis a, this type of

10:40:15 12  company that's not excluded, that's included, that they now have a

10:40:20 13  class release against, could have any losses associated with the

10:40:23 14  spill class membership and the right to recover are limited to

10:40:26 15  those who had a loss due to the spill.  So that's the position

10:40:29 16  they're talking in all of these appeals right now.

10:40:32 17       The class definition issue I thought was put to rest

10:40:35 18  before.  They continuously cite 1.3.1.2 where it talks about --

10:40:42 19       THE COURT:  As I recall, I haven't looked at that

10:40:45 20  recently, but beyond the geographic category, boundaries, the

10:40:53 21  Settlement Agreement is defined by basically who is excluded.  In

10:41:00 22  other words, there are express exclusions of certain industries,

10:41:06 23  businesses, things like that, I remember casinos, I think financial

10:41:11 24  institutions.  You can probably remind me who else, but BP

10:41:16 25  dealers --

EXHIBIT A

10:41:17  1          MR. HERMAN:  Yes.

10:41:18  2          THE COURT:  -- people like that are expressly excluded.

10:41:21  3   Are you saying that the appeals -- I noticed one of them said this

10:41:32  4   company, whatever it is, is not a member of the class.  Is it that

10:41:34  5   kind of argument they're making that it falls within an excluded

10:41:38  6   category or what is --

10:41:40  7          MR. HERMAN:  I don't believe so, Your Honor.  There are

10:41:42  8   basically three requirements for class membership.  One is that you

10:41:45  9   meet the geographical descriptions.

10:41:47 10          THE COURT:  Right.

10:41:48 11          MR. HERMAN:  The second is that you are not expressly

10:41:51 12   excluded.  And what I think is relevant here is they never said we

10:41:54 13   should exclude agricultural firms, construction firms or special

10:41:58 14   services companies.

10:41:58 15          THE COURT:  And then thirdly that you pass the causation

10:42:00 16   test.

10:42:01 17          MR. HERMAN:  Well, basically.  But the way the class

10:42:03 18   definition works, and I think Your Honor will recall, for Rule 23

10:42:05 19   purposes and they submitted expert reports on this, you have to

10:42:09 20   have objectively ascertainable criteria.  You can't be on some

10:42:12 21   subjective standard where people don't know whether they're in or

10:42:15 22   not based on whether they passed causation.  So what the class

10:42:19 23   definition does is it says:  "The following are summaries," and BP

10:42:22 24   keeps citing the summary without citing what it's summarizing, "of

10:42:27 25   the damage categories which are fully described in the attached

EXHIBIT A

10:42:30  1    exhibits."

10:42:30  2         THE COURT:  And there are about six different categories

10:42:32  3    of business economic claims, property damage, things like that.

10:42:38  4         MR. HERMAN:  Correct.  And the economic damage category

10:42:40  5    is the one we're talking about.  And, yes, the summary says it has

10:42:44  6    to be caused as a result of the incident; but the way that you find

10:42:48  7    out whether it's caused by the incident is you go to the exhibit,

10:42:53  8    which is Exhibit 4B which as Your Honor correctly identified

10:42:58  9    before, is the objective test by which we determine under this

10:43:02 10    settlement whether things are caused by the spill.  And BP is

10:43:05 11    continuing to, as Your Honor noted, just come back and say, well,

10:43:09 12    we don't think that it's caused by the spill, so we don't think

10:43:13 13    they're a class member and they don't have a right to recover.

10:43:16 14    Even though they meet the causation under 4B.

10:43:20 15         THE COURT:  Try to wrap it up because I need to give

10:43:24 16    Mr. Godfrey a few minutes of time.

10:43:26 17         MR. HERMAN:  Yes, Your Honor, just two things very

10:43:27 18    briefly.  They put in this footnote in these appeals, "We're aware

10:43:28 19    of the court's order but respectfully disagree."  Blah, blah, blah.

10:43:32 20    The problem that's created for the class members here is that the

10:43:37 21    March 5th order that Your Honor is I guess here today on for the

10:43:41 22    fifth time, is talking about matching and smoothing.  They're

10:43:45 23    really challenging alternative causation, and alternative causation

10:43:49 24    is not something that is supposed to be still a live issue.  That's

10:43:52 25    something that they agreed to in this very courtroom several months

EXHIBIT A

10:43:55 1    ago.

10:43:56 2            And what is very, I'll just say, offensive is, you know,

10:44:02 3    they put in here:  "Claimant executed a registration form and a

10:44:05 4    claim form, both under penalties of perjury, seeking recovery from

10:44:10 5    business economic losses arising from or due to the spill."  So

10:44:13 6    they're here filing a piece of paper that they agreed wasn't valid

10:44:18 7    several months ago in this courtroom before Your Honor, and they

10:44:21 8    have the nerve to imply or bully or intimidate or threaten class

10:44:29 9    members with "perjury" for filing the claims that they agreed by

10:44:33 10   objective standards would be compensated under the formula.

10:44:37 11           And I know the last thing Your Honor wants is another

10:44:40 12   motion or anything about what to do about this problem, but it's a

10:44:43 13   big problem for the class, and I think it just goes to the

10:44:48 14   disingenuity with which BP is here today.

10:44:51 15           I'll be happy to answer questions.

10:44:53 16           Also, Your Honor, on the motion to stay that they filed

10:44:55 17   yesterday, I know Your Honor said that you didn't want any more

10:44:59 18   briefing, I've never read it, but I feel pretty comfortable saying

10:45:03 19   that it should be denied for all of the reasons that we've already

10:45:07 20   submitted.

10:45:07 21           THE COURT:  It's really intertwined with what we're

10:45:11 22   talking about here today.

10:45:11 23           MR. HERMAN:  Thank you, Your Honor.

10:45:13 24           THE COURT:  Thank you.  Mr. Godfrey.

10:45:14 25           MR. GODFREY:  Thank you, Your Honor.

EXHIBIT A

10:45:15  1           THE COURT:  I'll give you about three minutes, because I
10:45:17  2   have to be off the bench in about five minutes.
10:45:19  3           MR. GODFREY:  I only need two minutes I think, Your
10:45:22  4   Honor.
10:45:22  5           THE COURT:  Okay.
10:45:23  6           MR. GODFREY:  First, I am not aware of any settlement
10:45:25  7   program accountant who has filed a declaration or affidavit saying
10:45:28  8   that they agree with the interpretation of the claims
10:45:31  9   administrator.  They did file declarations but they studiously
10:45:35 10   avoided that issue.  So unless I missed it, in which case I
10:45:39 11   apologize, but I don't think I did, I am not aware of anyone from
10:45:42 12   Price Waterhouse who said that this is the way you interpret the
10:45:44 13   word revenue or expense or corresponding variable expenses.
10:45:47 14           Second, the April 4 memo, to the extent the Court
10:45:52 15   wants --
10:45:52 16           THE COURT:  Let me ask you this.  Is it correct, I want
10:45:54 17   to make sure I have the sequence, that this came to your attention
10:46:01 18   because long before Mr. Juneau issued his January 15th policy
10:46:05 19   statement on this issue, the program was analyzing and paying these
10:46:13 20   claims in the same manner, and that's what brought it to your
10:46:16 21   attention, correct?
10:46:17 22           MR. GODFREY:  It came to our attention when the portal
10:46:19 23   opened up in September where we had access to the underlying claim
10:46:23 24   data, we started to see some aberrations that led to the
10:46:25 25   October 2nd call.  I would encourage Your Honor to carefully read

EXHIBIT A

10:46:28 1   Mr. Hacker's declaration as compared to the arguments in the

10:46:30 2   briefs.

10:46:31 3           THE COURT:  That's not my question.  My question is, is

10:46:35 4   it correct that it came to your attention, I think it's obvious,

10:46:39 5   that it came to your attention because the claims facility, program

10:46:48 6   was routinely, I guess I would say, that's how they were

10:46:51 7   interpreting and applying the program before -- this wasn't a

10:46:55 8   change in what he did as of January 15th?

10:46:59 9           MR. GODFREY:  That's not quite correct.  We started

10:47:02 10  seeing awards we couldn't understand.  We had a call in October, we

10:47:05 11  thought we understood them, and then we saw more awards in

10:47:08 12  November.  And this issue arose after the fairness hearing --

10:47:12 13          THE COURT:  I still think you're not answering any

10:47:14 14  question, Mr. Godfrey.  It came to your attention because that's

10:47:18 15  how they were applying it and it came to your attention that they

10:47:21 16  were applying it in a manner that you think was wrong, and,

10:47:23 17  therefore, that ultimately led to the January 15, after some back

10:47:27 18  and forth, to the January 15, "official" policy statement.

10:47:30 19          MR. GODFREY:  The chronology is that it came to our

10:47:33 20  attention before January 15th, but we did not understand what he

10:47:37 21  was doing in October if that's the question.

10:47:38 22          THE COURT:  No, that's not my question.

10:47:40 23          MR. GODFREY:  We are ships passing in the night then, I

10:47:43 24  apologize.

10:47:44 25          THE COURT:  I think this could be answered yes or no.  I

EXHIBIT A

10:47:47   1   feel like I am cross-examining a witness with all due respect.  But
10:47:50   2   isn't it true, is it true that it came to your attention because
10:47:53   3   that's how they were applying, they being the program, that's how
10:47:57   4   they were applying the BEL provisions before, long before the
10:48:03   5   January 15 policy statement, and that's what brought it to your
10:48:06   6   attention in the first place?
10:48:07   7          MR. GODFREY:  We discovered that they were --
10:48:08   8          THE COURT:  Can you answer that question?
10:48:09   9          MR. GODFREY:  Yes, Your Honor, before January 15th, we
10:48:11  10   figured this out sometime late November, early December.
10:48:15  11          THE COURT:  Okay.  So I just wanted to understand that it
10:48:17  12   wasn't that Mr. Juneau issues a January 15 policy statement that
10:48:23  13   all of a sudden changed what he and his team accountants and all
10:48:29  14   were doing long before that.
10:48:30  15          MR. GODFREY:  No.  We figured out what they were doing in
10:48:32  16   November, December time frame that led to the December 16th
10:48:36  17   exchange and then the January 15th issue.
10:48:39  18          Second point, the April 4 memo, setting aside the Rule
10:48:44  19   408 problem, I encourage Your Honor to read that.  The accounts
10:48:46  20   there are trying to match, they use the word matching.  They're not
10:48:49  21   saying, oh, you're not matching under the agreement, they're trying
10:48:51  22   to figure out how to do it.  It proves just the opposite of the
10:48:54  23   argument being made.
10:48:55  24          Third:  This court and this district court is the
10:48:58  25   supervisory agent or supervisory power, judicial power over

EXHIBIT A

10:49:02  1  Mr. Juneau.  Obviously this court has an appellate court to which

10:49:06  2  supervises what this court does.  This court, respectfully, we

10:49:10  3  never anticipated this problem coming up, but we have to take an

10:49:15  4  appeal; ultimately the Court of appeals will decide.  But it is not

10:49:18  5  true to say that this court has the final word, it has the final

10:49:22  6  word in the district court sense like every other district court

10:49:25  7  and we respect that, although we disagree with the court in this

10:49:27  8  instance.

10:49:28  9      THE COURT:  You're certainly not suggesting that people

10:49:30  10  are subject to my orders and judgments don't have to follow them

10:49:35  11  unless and until they're affirmed by the Fifth Circuit?

10:49:37  12      MR. GODFREY:  Not at all, Your Honor, not at all.  That

10:49:38  13  decision was decided years ago by the Supreme Court.  I think there

10:49:41  14  was a man from the UAW who took the opposite position and learned

10:49:45  15  the hard way that that is not a proper approach.  So not at all.

10:49:50  16      I am simply saying that in answer to Mr. Herman's point

10:49:52  17  that suggested you have the final word -- you have the final

10:49:53  18  word --

10:49:53  19      THE COURT:  Well, that's an issue I will let you all

10:49:56  20  decide somewhere else.

10:49:57  21      MR. GODFREY:  Correct.  There's no question that once

10:49:58  22  Your Honor has ruled, I am bound by it unless the Fifth Circuit

10:50:01  23  tells me something differently.

10:50:02  24      THE COURT:  Let me ask you this real quick.  I am

10:50:05  25  troubled by something that -- I am troubled by the implications or

EXHIBIT A

10:50:13  1   the potential fallout of something that Mr. Stanley alluded to.  I

10:50:21  2   mean, if you have the right to sue the claims administrator for

10:50:25  3   essentially doing his job, which as I see it he is applying and

10:50:29  4   interpreting a contract, the agreement as he sees and as I've

10:50:34  5   agreed with him at this point.  If you can sue him for that, why

10:50:39  6   can't anybody else sue him that's not happy with what he did?  Any

10:50:43  7   claimant that's turned down can file a suit here and say he is

10:50:46  8   breaching the contract by not honoring my claim?

10:50:48  9          MR. GODFREY:  No --

10:50:49  10          THE COURT:  And say we disagree with his interpretation

10:50:53  11   of how he's applied the contract, the agreement, I mean to my

10:50:56  12   claim?

10:50:56  13          MR. GODFREY:  There are a couple of answers to that, Your

10:50:58  14   Honor.  If the Court were to be concerned about that issue, then

10:51:02  15   the solution is that some courts have done to appoint him as a real

10:51:06  16   special master under Rule 53.  There are consequences though to

10:51:10  17   Mr. Juneau with that appointment, there are benefits and there are

10:51:13  18   certain limitations about who want he can and cannot do.

10:51:16  19          THE COURT:  So unless I appoint him under Rule 53 he is

10:51:19  20   subject to being sued by anybody who wants to sue him?

10:51:23  21          MR. GODFREY:  No, no.  With us he has a direct contract

10:51:25  22   that has to mean something, otherwise the contract means nothing.

10:51:30  23          THE COURT:  What about somebody who is a beneficiary, if

10:51:31  24   the contract says and the program says he is to interpret it, I

10:51:35  25   think for the benefit -- the beneficiaries of the trust are the

EXHIBIT A

| | | |
|---|---|---|

10:51:40  1   class members, right?

10:51:41  2         MR. GODFREY:  The beneficiaries of the -- well, the class

10:51:44  3   members have rights under the Settlement Agreement.

10:51:47  4         THE COURT:  Yeah.

10:51:49  5         MR. GODFREY:  I don't think --

10:51:51  6         THE COURT:  They certainly have rights, so I don't know

10:51:53  7   whether we talk about them as third-party beneficiaries or

10:51:57  8   whatever.

10:52:00  9         MR. GODFREY:  I think as a technical matter their rights

10:52:02 10   are to appear before the court seeking relief before this court.

10:52:06 11         THE COURT:  Maybe that's your rights, too, as the other

10:52:08 12   side would say you've done.  But I am having trouble limiting your

10:52:13 13   argument to just you.  It would only apply to BP.

10:52:18 14         What if I had ruled in your favor and they were here

10:52:22 15   telling me I should enjoin the administrator from applying it the

10:52:25 16   way BP wants it applied?  I suspect you might be here saying they

10:52:31 17   don't have a right to do that.

10:52:32 18         MR. GODFREY:  I think class counsel has separate rights

10:52:34 19   that are different from the class in this instance, Your Honor, I

10:52:37 20   don't agree with that proposition.  But I would say that the

10:52:39 21   solution to this issue --

10:52:40 22         THE COURT:  So any time they don't agree they can do the

10:52:43 23   same thing you've done, they can sue Mr. Juneau?

10:52:46 24         MR. GODFREY:  We looked at the case law on this before we

10:52:48 25   actually --

EXHIBIT A

| | | |
|---|---|---|
| 10:52:48 | 1 | THE COURT:  Could they sue Mr. Juneau? |
| 10:52:50 | 2 | MR. GODFREY:  I think if they wanted to seek an |
| 10:52:52 | 3 | enforcement they would have a right to do that, yes. |
| 10:52:53 | 4 | THE COURT:  And who else could sue him? |
| 10:52:54 | 5 | MR. GODFREY:  I think that's it, I think it's limited. |
| 10:52:56 | 6 | THE COURT:  Just BP and the class? |
| 10:52:58 | 7 | MR. GODFREY:  I believe so. |
| 10:52:59 | 8 | THE COURT:  Members of the class, not just class counsel? |
| 10:53:01 | 9 | MR. GODFREY:  No, class members I think are entitled to |
| 10:53:02 | 10 | seek relief from the court. |
| 10:53:04 | 11 | THE COURT:  Why couldn't they see sue him? |
| 10:53:06 | 12 | MR. GODFREY:  I haven't actually looked at that, Your |
| 10:53:08 | 13 | Honor, but I think the answer is -- |
| 10:53:08 | 14 | THE COURT:  It's a big problem if he's subject to |
| 10:53:11 | 15 | lawsuits by anybody that's not happy with something he does. |
| 10:53:13 | 16 | MR. GODFREY:  There is no question, Your Honor, that you |
| 10:53:16 | 17 | raise a policy question.  The law does not address this, the law |
| 10:53:19 | 18 | says the solution is if you want to avoid this, appoint him as a |
| 10:53:24 | 19 | special master pursuant to Rule 53, that's why they can't find |
| 10:53:26 | 20 | cases for the motion to dismiss. |
| 10:53:28 | 21 | THE COURT:  Maybe nobody's ever sued them like you have |
| 10:53:32 | 22 | in this case. |
| 10:53:33 | 23 | MR. GODFREY:  I'm not sure about that, Your Honor, but I |
| 10:53:35 | 24 | can tell you that I know what the solution to the issue is if the |
| 10:53:36 | 25 | court would want me to do that, but there are limitations upon |

EXHIBIT A

10:53:38  1   Mr. Juneau.

10:53:38  2         THE COURT:  Are you suggesting I should appoint him under

10:53:42  3   Rule 53?

10:53:42  4         MR. GODFREY:  No, I did that to the court.  The

10:53:45  5   supervisor of this settlement in the first instance is the court,

10:53:47  6   this court is the parties and the Court knows.

10:53:50  7         On the Exhibit 4B versus Exhibit 4C.  Class counsel

10:53:55  8   continue to want to talk about causation, and we will set aside

10:53:58  9   some of the argument, maybe that's for a later day; but everything

10:54:01 10   we said, including when we quoted from Mr. Holstein's letter said:

10:54:05 11   Accurate data, monthly revenue, variable expenses.  And that goes

10:54:09 12   back to whether or not the Exhibit 4C, variable profits calculation

10:54:13 13   is being done properly.  We think that the problem here, setting

10:54:16 14   aside causation, is that it as it is not being done properly.  I

10:54:22 15   think the Court knows our position on that.  I would ask the Court

10:54:24 16   to consider that.  There's no reason for me to repeat that.

10:54:28 17         But in answer to your question about where are most of

10:54:31 18   these claims coming from, well, 50 percent of the new claims are

10:54:34 19   now coming from Zone D.  This is a feedback effect, economists call

10:54:38 20   it, where people are making claims from Zone D based upon

10:54:43 21   differential cash flows, not based upon the variable profits

10:54:47 22   analysis that we thought we had agreed to and that we think that

10:54:50 23   the agreement plainly says we did agree to.  And at least the

10:54:54 24   fictitious awards.

10:54:55 25         One final point.  It is true, it is true that in the

EXHIBIT A

10:54:58  1    January 15th BEL policy decisions, Mr. Juneau said we will make

10:55:04  2    some adjustments.  It is not true that the adjustments are being

10:55:08  3    made daily.  Every day they're awarding claimants which have

10:55:13  4    year-end adjustments, whether they have negative revenue or

10:55:15  5    overbilling or errors of any type.  And many times the claimants

10:55:20  6    point them out themselves that they use the monthly financials as

10:55:23  7    submitted.  It is a direct result of the application of the BEL

10:55:26  8    policy decisions, and if the Court thinks that that is incorrect at

10:55:30  9    a minimum, that is a reason for the injunction to stop these

10:55:32 10    fictitious awards from being issued.

10:55:35 11         THE COURT:  Let me ask you one more thing before you sit

10:55:37 12    down.  And I do have to leave.  Mr. Herman mentioned something that

10:55:43 13    I had not heard before that BP is appealing some of these awards

10:55:49 14    not solely on the BEL, not the issue that we're here on today and

10:55:54 15    that's the subject of the March 5th order, but on I'll call it the

10:56:00 16    underlying causation; in other words, arguing that basically the

10:56:06 17    business, the losses must have been caused by something else, not

10:56:11 18    by the oil spill.  Is that accurate?  Is BP now taking that

10:56:16 19    position?

10:56:16 20         MR. GODFREY:  I am not on the appellate side of the

10:56:18 21    house, that's another firm that runs that.  But I can tell you what

10:56:21 22    I know.  There's a definition that the Court affirmed in the class

10:56:26 23    agreement that says people who have suffered damages caused by the

10:56:30 24    spill where the objective data shows that the damage was not caused

10:56:35 25    by the spill.  And some cases the claimants submit it wasn't caused

EXHIBIT A

10:56:39  1    by the spill.  I believe appeals are being taken on that ground.

10:56:42  2         THE COURT:  That's not what I understood Mr. Herman to

10:56:46  3    say, but that's neither here nor there because that's not the issue

10:56:48  4    before the Court, but I just wanted to give you a chance.

10:56:50  5         MR. GODFREY:  I should point out though one point about

10:56:53  6    appeals.  We've appealed as of Monday 2.8 percent of the awards, BP

10:56:57  7    thus far of all appeals that either side has taken has won

10:57:02  8    79 percent of the appeal and a bunch of other appeals and certain

10:57:05  9    percent have been resolved amicably by the parties, more in favor

10:57:08 10    of BP than the other side.  So the notion that somehow the

10:57:11 11    appellate process is being abused, I think the data is really to

10:57:14 12    the contrary.  If the Court wanted the data in the form of a

10:57:18 13    declaration, we'd do it, but I think that's available from the

10:57:19 14    settlement claims administrator as well.

10:57:21 15         With that, Your Honor, I greatly appreciate your time

10:57:24 16    this morning, I know you've visited this issue before.  I think our

10:57:26 17    position is clear on the record, but I also think that we should

10:57:28 18    have an injunction to protect us against us in the interim these

10:57:32 19    continued awards that in our view, based upon hard, cold economic

10:57:37 20    data are fictitious for people who have no actual losses

10:57:41 21    whatsoever.  It's not just they have some loss and it's an

10:57:43 22    exaggerated award, they have no losses whatsoever, however

10:57:46 23    measured.

10:57:46 24         Thank you very much, Your Honor.

10:57:47 25         THE COURT:  Thank you.  The Court has spent, as I said,

EXHIBIT A

10:57:52  1    an enormous amount of time dealing with this issue, not just today
10:57:55  2    and in preparation for this hearing this morning, but in going back
10:57:59  3    to -- I'm not sure when I first got involved, I guess it was in
10:58:03  4    February -- no, must have been January I guess.  And as I said,
10:58:08  5    this is at least the third time that the curt has had to review and
10:58:13  6    look at this issue.

10:58:16  7          And despite the fact that the record has continued to
10:58:20  8    grow, I don't think it changes the fundamental issue before the
10:58:28  9    Court.  And, first of all, I'll say that to the extent this is a
10:58:34 10    motion for reconsideration, which I guess I could construe it as
10:58:38 11    before the Court, of my March 5th, 2013, order where I set forth in
10:58:47 12    some detail the reasons why I interpreted the Settlement Agreement
10:58:52 13    in the same way that the claims administrator had interpreted it in
10:58:56 14    his January 15th policy decision, for those same reasons, I see no
10:59:01 15    basis on which I would consider changing my view of that, of that
10:59:09 16    order.

10:59:10 17          As a consequence of that, what's before the Court this
10:59:15 18    morning as a procedural matter are the following:  As I said, there
10:59:24 19    is a motion to dismiss filed by the defendants in Civil Action
10:59:29 20    13-492, it's filed against the claims administrator Mr. Juneau and
10:59:33 21    the settlement program itself.  I agree essentially with the
10:59:40 22    reasons advanced by counsel for the claims administrator and the
10:59:44 23    settlement program, that the claims alleged by BP in 13-492 do not,
10:59:56 24    that is that they failed to state a claim against either defendant
11:00:04 25    because in essence what is alleged against Mr. Juneau is that he is

EXHIBIT A

11:00:10  1   complying with an order of the court.  As a matter of law, that

11:00:16  2   cannot be a situation where he is breaching the agreement.

11:00:23  3         So I am granting the motion to dismiss 13-492, that

11:00:31  4   lawsuit under Rule 12(b)(6).

11:00:37  5         Second matter before the Court in that same lawsuit there

11:00:40  6   is a motion for preliminary injunction, that is, as I see it, moot

11:00:45  7   because the court's now dismissed that lawsuit.

11:00:52  8         Third matter before the Court is a related practically

11:00:56  9   identical motion for preliminary motion for the *Bon Secour* class

11:01:01 10   action, Civil Action 12-970.  In that case the claims administrator

11:01:10 11   and settlement program are not parties to the lawsuit, but

11:01:14 12   nonetheless they have opposed the preliminary injunction; and so as

11:01:21 13   class counsel and for the reasons I've stated here today, there's

11:01:26 14   no basis on which if I consider the four factors that are required

11:01:33 15   for granting a preliminary injunction:  First of all, likelihood of

11:01:40 16   success on the merits by the moving party, second factor being

11:01:49 17   irreparable harm, and the third and fourth factors deal with

11:01:55 18   weighing the harm or injury to be caused by, in consequence of the

11:02:04 19   court's either granting or denying the request for injunctive

11:02:09 20   relief.  When I consider those factors, I find that BP's motion for

11:02:13 21   preliminary injunction should be denied.

11:02:17 22         In essence, as Mr. Godfrey candidly admitted, this is

11:02:24 23   nothing more than, as he put it, a belt-and-suspenders procedural

11:02:30 24   maneuver by BP to attempt to gain some appellate right that

11:02:38 25   apparently -- appellate rights that apparently is not entirely

EXHIBIT A

11:02:45  1    convinced that it has otherwise because otherwise there would have

11:02:48  2    been no need to file a motion for preliminary injunction.

11:02:56  3         Since they have now appealed my order, filed a notice of

11:03:00  4    appeal and filed a request for a stay, so I am denying the motion

11:03:04  5    for preliminary injunction in *Bon Secour*.

11:03:09  6         And finally, insofar as the request for a stay of my

11:03:12  7    March 5th order, which was filed sometime yesterday I believe, I

11:03:15  8    saw it this morning for the first time, the analysis would be

11:03:21  9    essentially the same for the same reason that I am not revisiting

11:03:27  10   my March 5th order and not granting preliminary injunction, I am

11:03:31  11   also not going to stay my order.

11:03:36  12        So I think that covers everything.  Have a good day.

11:03:40  13        THE DEPUTY CLERK:  All rise.

11:03:41  14      (WHEREUPON, THE PROCEEDINGS WERE CONCLUDED.)

         15                    *  *  *  *  *  *

         16                    REPORTER'S CERTIFICATE

         17

         18        I, Karen A. Ibos, CCR, Official Court Reporter, United
              States District Court, Eastern District of Louisiana, do hereby
              certify that the foregoing is a true and correct transcript, to the
         19   best of my ability and understanding, from the record of the
              proceedings in the above-entitled and numbered matter.

         20

         21

         22
                                   _____
         23                        Karen A. Ibos, CCR, RPR, CRR, RMR
                                   Official Court Reporter
         24

         25

EXHIBIT A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: OIL SPILL BY THE OIL RIG                    MDL 10-2179
DEEPWATER HORIZON IN THE GULF
OF MEXICO ON APRIL 20, 2010                         SECTION J (1)

                                                   JUDGE BARBIER
                                                   MAG. JUDGE SHUSHAN
-----------------------------------------------------------------------------------------------
                                                   THIS PERTAINS TO:
BP EXPLORATION & PRODUCTION INC. ET AL             C.A. 13-492
V. DEEPWATER HORIZON COURT SUPERVISED
SETTLEMENT PROGRAM ET AL

J U D G M E N T

Considering the court's reasons, orally stated on the record, on April 5, 2013,

IT IS ORDERED, ADJUDGED AND DECREED that there be judgment in favor of

defendants, Deepwater Horizon Court Supervised Settlement Program and Patrick A

Juneau—in his official capacity as Claims Administrator administering the Deepwater

Horizon Economic and Property Damages Settlement Agreement as Amended on May 2,

2012, and in his official capacity as Trustee of the Deepwater Horizon Economic and

Property Damages Settlement Trust—and against plaintiffs, BP Exploration & Production

Inc. and BP America Production Company, dismissing the plaintiffs' suit with prejudice, at

plaintiffs' cost.

New Orleans, Louisiana, this 8th  day of APRIL, 2013.

_____
CARL J. BARBIER
UNITED STATES DISTRICT JUDGE

EXHIBIT B